STATE OF CONNECTICUT *v.* NELSON TUCHMAN
(SC 15582)

Callahan, C. J., and Berdon, Norcott, Katz and McDonald, Js.

Argued June 5—officially released August 12, 1997

*Hubert J. Santos*, with whom were *Patrick Bristol* and, on the brief, *Hope C. Seeley*, for the appellant (defendant).

*Carolyn K. Longstreth*, assistant state's attorney, with whom were *David E. Sullivan*, assistant state's attorney, and, on the brief, *John M. Bailey*, chief state's attorney, and *James E. Thomas*, state's attorney, for the appellee (state).

*Richard Blumenthal*, attorney general, and *Richard J. Lynch, Arnold I. Menchel* and *Jennifer C. Jaff*, assistant attorneys general, filed a brief for the attorney general as amicus curiae.

*Opinion*

CALLAHAN, C. J. The principal issue in this appeal is whether the double jeopardy clause of the fifth amendment to the United States constitution[1] or article first, § 9, of the Connecticut constitution[2] prohibits the criminal prosecution of the defendant, Nelson Tuchman, for wrongfully obtaining approximately $420,000 in medicaid reimbursement when the state of Connecticut, acting administratively through the department of social services (department), had already sanctioned him for his allegedly criminal conduct.

The following facts and procedural history are undisputed. The defendant was the owner and operator of Winthrop Health Care Center, Inc. (Winthrop), a nursing home facility participating in the medicaid program. The medicaid program, established in 1965 as Title XIX of the Social Security Act and codified at 42 U.S.C. § 1396 et seq., is a joint federal-state venture providing financial assistance to persons whose income and resources are inadequate to meet the costs of, inter

---

[1] The fifth amendment to the United States constitution is made applicable to the states by the fourteenth amendment. *Benton* v. *Maryland*, 395 U.S. 784, 793-96, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).

[2] While there is no explicit prohibition against double jeopardy in the Connecticut constitution, we have held that the due process clause of article first, § 9, impliedly contains such protection. *Kohlfuss* v. *Warden*, 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962).

alia, necessary nursing home care. See *Burinskas* v. *Dept. of Social Services*, 240 Conn. 141, 148, 691 A.2d 586 (1997). States wishing to participate in the medicaid program "must develop a plan, approved by the secretary of health and human services, containing reasonable standards . . . for determining . . . the extent of medical assistance" to be provided. 42 U.S.C. § 1396a (a) (17). Connecticut has elected to participate in the medicaid program and has assigned the task of its administration to the department. General Statutes § 17b-260.

Under the Connecticut medicaid plan, the rate of reimbursement a participating nursing home receives from the department is based on data submitted in the facility's annual report of long term care costs (cost report). General Statutes §§ 17b-238 (a) and 17b-340; Regs., Conn. State Agencies § 17-311-51. The department is authorized to reduce a provider's rate of reimbursement in order to recoup overpayments made to the provider based on false or misleading cost reports. General Statutes § 17b-238 (c); Regs., Conn. State Agencies § 17-311-53 (b).[3]

---

[3] General Statutes § 17b-238 (c), which was formerly General Statutes § 17-311 (c), provides in relevant part: "The submission of any false or misleading fiscal information or data to said commissioner shall be grounds for suspension of payments by the state under sections . . . 17b-340 . . . in accordance with regulations adopted by said commissioner. In addition, any person, including any corporation, who knowingly makes or causes to be made any false or misleading statement or who knowingly submits false or misleading fiscal information or data on the forms approved by the commissioner shall be guilty of a class D felony."

Section 17-311-53 of the Regulations of Connecticut State Agencies provides in relevant part:

"(a) The per diem rate of payment . . . shall be determined by desk review of the submitted annual report . . . .

"(b) Whenever the Commissioner of Income Maintenance renders a rate decision . . . which decision results in the facility being indebted . . . for past Medicaid overpayments, the department shall recoup said Medicaid overpayments as soon as possible from the department's monthly Medicaid payments to the facility. . . ."

In preparing its annual cost report, a medicaid provider is required to treat costs incurred by virtue of leases executed with a related entity differently from those incurred under leases resulting from arms length transactions. In particular, if the lessor is a related entity that exists solely for the purpose of executing the lease, the provider's cost cannot exceed the lessor's actual cost. Regs., Conn. State Agencies § 17-311-52; 42 C.F.R. § 413.17.

In 1993, the department conducted an investigation of Winthrop and determined that: (1) the defendant had submitted cost reports for fiscal years 1986, 1987, 1988 and 1989 that falsely reported Winthrop's actual expenses and falsely represented certain leases as arms length transactions; and (2) Winthrop thereby wrongfully had obtained approximately $420,000 in excess medicaid reimbursement. Those determinations resulted in the three administrative actions that form the basis of the defendant's double jeopardy claims. First, pursuant to § 17b-238 (c), the department initiated recoupment proceedings against Winthrop and subsequently withheld approximately $450,000 from Winthrop's ongoing reimbursement payments. Second, after the department of public health and addiction services placed Winthrop into receivership because it had sustained a serious financial loss that jeopardized patient welfare, the receiver was instructed by the department not to pay the defendant a salary. Third, when Winthrop subsequently was sold, the department included in the facility's new medicaid contract a restrictive covenant prohibiting Winthrop from doing business with the defendant.

Meanwhile, as a result of an independent police investigation, the defendant was charged with larceny in the first degree in violation of General Statutes §§ 53a-122

(a) and 53a-11.[4] The specific theory of larceny charged by the state is that the defendant obtained property by false pretenses as defined by General Statutes § 53a-119 (2).[5] Claiming that the department's actions constituted punishment for purposes of double jeopardy under both the federal and state constitutions, the defendant filed a motion to dismiss. After conducting an evidentiary hearing, the trial court, *Koletsky, J.*, denied the defendant's motion. The defendant took an interlocutory appeal to the Appellate Court, which we transferred to ourselves pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).[6] We affirm the trial court's denial of the defendant's motion to dismiss.

As a threshold matter, we must determine the applicable standard of review. Because the issue of whether an administrative sanction constitutes punishment for

---

[4] General Statutes § 53a-122 provides in relevant part: "Larceny in the first degree: Class B felony. (a) A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and: (1) The property or service, regardless of its nature and value, is obtained by extortion, (2) the value of the property or service exceeds ten thousand dollars, (3) the property consists of a motor vehicle, the value of which exceeds ten thousand dollars, or (4) the property is obtained by defrauding a public community, and the value of such property exceeds two thousand dollars. . . ."

General Statutes § 53a-11 provides: "A person shall be criminally liable for conduct constituting an offense which he performs or causes to be performed in the name of or in behalf of a corporation to the same extent as if such conduct were performed in his own name or behalf."

[5] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to . . .

"(2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person. . . ."

[6] "Colorable claims of double jeopardy are an exception to the general rule that appeals in criminal cases must ordinarily await the final judgment that arises from imposition of sentence." *State* v. *Aparo*, 223 Conn. 384, 386 n.4, 614 A.2d 401 (1992), cert. denied, 507 U.S. 972, 113 S. Ct. 1414, 122 L. Ed. 2d 785 (1993); *Abney* v. *United States*, 431 U.S. 651, 659–62, 97 S. Ct. 2034, 52 L. Ed. 2d 651 (1977).

purposes of double jeopardy is a question of law, we review it de novo. See *United States* v. *Morgan*, 51 F.3d 1105, 1110 (2d Cir. 1995). The factual findings of the trial court that underlie the determination of that question, however, are entitled to the same deference on appeal that other factual findings command. See *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992). Thus, those findings must stand unless they are clearly erroneous. Practice Book § 4061.[7]

The double jeopardy clause of the fifth amendment to the United States constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." The double jeopardy clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction and multiple punishments for the same offense. *North Carolina* v. *Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969). In the present case, the third of these protections is at issue. We must determine, therefore, whether any of the three administrative actions taken by the department against the defendant constituted punishment that bars subsequent criminal prosecution.

I

The defendant first maintains that the department's withholding of approximately $450,000 in medicaid reimbursement from Winthrop constituted punishment to him for purposes of double jeopardy.[8] In *State* v.

---

[7] Practice Book § 4061 provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law. . . ."

[8] The funds were recouped from Winthrop, a corporation, not from the defendant, the owner of the corporation. Because we decide that the recoupment of funds from Winthrop was not punitive either in purpose or as applied, we need not address the issue of whether the recoupment of funds from Winthrop acted as a sanction against the defendant himself.

*Hickam*, 235 Conn. 614, 668 A.2d 1321 (1995), cert. denied, 517 U.S. 1221, 116 S. Ct. 1851, 134 L. Ed. 2d 951 (1996), we utilized a two-pronged approach for determining whether administrative action constitutes punishment for purposes of double jeopardy. Under that approach, which is based on the United States Supreme Court's explicit holding in *United States* v. *Halper*, 490 U.S. 435, 448–49, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989), we assess: (1) the purpose the sanction is designed to serve; and (2) the nature of the particular sanction as applied to the defendant. A sanction that primarily serves a legitimate remedial purpose and is related rationally to that purpose does not give rise to a double jeopardy violation. *State* v. *Hickam*, supra, 623.[9]

The defendant does not dispute the applicability of the *Hickam* approach to his federal claims but argues rather that the withholding of funds does not pass muster under either prong of the *Hickam* test. In particular, he maintains that: (a) the purpose of the statutory recoupment authorization, § 17b-238 (c), is primarily punitive rather than remedial; and (b) the nature of the particular recoupment at issue in this case was punitive. We disagree.

A

On the basis of the language of § 17b-238 (c), the language of its implementing regulation, § 17-311-53 (b) of the Regulations of Connecticut State Agencies, and the legislative history of § 17b-238 (c), we conclude that

---

[9] At the time *Hickam* was decided, there was some controversy as to the effect of language in *Halper* suggesting that sanctions whose purpose is not purely remedial (i.e., sanctions that also serve some retributive or deterrent purpose) must be construed as punitive. In *United States* v. *Ursery*, 518 U.S. 267, 284 n.2, 116 S. Ct. 2135, 135 L. Ed. 2d 549 (1996), however, the United States Supreme Court, concluding as we did in *Hickam* that the language in question, which contradicts the *Halper* court's explicit holding, was dictum, declined to adopt that rule.

the legislature intended recoupment to serve a remedial, rather than punitive, purpose.

The language of § 17b-238 (c) strongly suggests that the legislature intended recoupment to be remedial. The subsection consists of two sentences. The language authorizing the department to recoup overpayments is found in the first sentence: "[t]he submission of any false or misleading fiscal information or data . . . shall be grounds for suspension of payments . . . in accordance with regulations adopted by [the] commissioner." The absence of any reference to wrongful intent in that sentence seriously undercuts the defendant's argument that recoupment is intended to serve a punitive purpose. The fact that recoupment applies to providers who inadvertently submit incorrect information as well as to those who do so with wrongful intent indicates that the legislature intended it to serve a remedial, not a punitive purpose. See *Kansas* v. *Hendricks*, 521 U.S. 346, 362, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) ("[t]he existence of a scienter requirement is customarily an important element in distinguishing criminal . . . statutes"); *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 168, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963) (tests traditionally applied to determine whether statute serves penal purpose include "whether [the sanction] comes into play only on a finding of scienter").

Moreover, the language of the implementing regulation, § 17-311-53 (b), also indicates that the legislature intended recoupment to serve a remedial purpose: "Whenever the Commissioner . . . renders a rate decision . . . which decision results in the facility being indebted . . . for past Medicaid overpayments, the department shall recoup said Medicaid overpayments as soon as possible from the department's monthly Medicaid payments to the facility. . . ." The fact that the amount withheld from providers pursuant to the first sentence of § 17b-238 (c) is merely the amount of debt

due to overpayment suggests that the legislature intended recoupment to act as a process for making the state whole rather than as a mechanism for punishing wrongdoers.[10]

Furthermore, the defendant's reliance on the second sentence of § 17b-238 (c), which imposes criminal liability for "knowingly submit[ting] false or misleading fiscal information or data" is misplaced. Originally enacted[11] in 1977 as General Statutes § 17-311 (c), what is now § 17b-238 (c) included only the sentence authorizing recoupment. See General Statutes (Rev. to 1979) § 17-311 (c). In 1981, the subsection was amended[12] by adding the sentence imposing criminal liability for knowingly submitting false information. See General Statutes (Rev. to 1983) § 17-311 (c). Nothing in the language of the added second sentence suggests, however, that in amending the subsection, the legislature sought to affect the first sentence. Hence despite the defendant's assertion to the contrary, the second sentence does nothing to dispel the strong implication arising from the first sentence and its implementing regulation that the legislature did not intend recoupment to serve a punitive purpose.

The legislative history of § 17b-238 (c) also supports our conclusion. The recoupment provision of § 17b-238 (c), formerly § 17-311 (c), was enacted by way of Public Acts 1977, No. 77-593, which also addressed nursing home audits and investigations. The floor debate on House Bill No. 8036, which ultimately became Public Act 77-593, is quite sparse. The defendant maintains

---

[10] The amount recouped in this case, $450,000, includes approximately $420,000 attributed to the defendant's allegedly fraudulent conduct and approximately $30,000 attributed to other overpayments. Those figures were the result of a negotiated agreement between the defendant and the department.

[11] Public Acts 1977, No. 77-593.

[12] Public Acts 1981, No. 81-249.

that comments made by two legislators, Representative Benjamin N. DeZinno, Jr.,[13] and Representative Virginia S. Connolly,[14] indicate that the legislature intended recoupment to serve a punitive purpose. We are unpersuaded. The comments on which the defendant relies are brief, isolated and ambiguous. They do not provide a sufficient basis for concluding that a statute obviously enacted to permit recovery of wrongfully disbursed state funds was designed to serve a punitive purpose.

The legislative history of the second sentence of § 17b-238 (c), which was enacted by way of Public Acts 1981, No. 81-249, buttresses our conclusion. There is nothing in the legislative history of Senate Bill No. 1219, which ultimately became Public Act 81-249, to indicate that the second sentence was necessary to implement the first sentence. To the contrary, the remarks of Senator Howard T. Owens, Jr., during the floor debate suggest that while imposition of criminal liability was designed to serve a punitive purpose, recoupment of overpayments was not. Noting that the bill would criminalize knowingly submitting false or misleading cost reports, and making no reference whatsoever to recoupment, Owens reported to the Senate that "we feel that

---

[13] Representative DeZinno, commented that "this bill would require nursing homes to retain financial and real estate records for specified time periods and to present these records for inspection upon request. It would also provide penalties for failure to retain records and it would allow the State to suspend payment to the nursing homes which intentionally submit false or misleading fiscal data. The intent is to prevent the disappearance or destruction of nursing home records necessary for these audits and the authority to undertake necessary audits and to penalize the failure to maintain and provide essential information [which] would aid the State in its ongoing effort to insure optimum use of public funds." 20 H.R. Proc., Pt. 13, 1977 Sess., p. 5499.

[14] Representative Connolly remarked: "I think instead of pointing the finger at any particular nursing home, [the bill] tends to preclude the abuses or pyramiding practices such as has happened in New York or other states around us. I think it's a good preventative measure and I will support the bill." 20 H.R. Proc., Pt. 13, 1977 Sess., p. 5501.

*this penalty is adequate* for the crime that might be charged." (Emphasis added.) 24 S. Proc., Pt. 7, 1977 Sess., p. 2343.

Accordingly, after carefully reviewing the language and legislative history of § 17b-238 (c) and the language of § 17-311-53 (b), we conclude that the legislature intended recoupment to serve a purely remedial purpose, and it served that purpose in this instance by allowing the department to recover its losses.

## B

Our analysis of the recoupment of funds from Winthrop is guided by *United States* v. *Halper*, supra, 490 U.S. 435.[15] In *Halper*, the defendant submitted sixty-five inflated medicare claims, each of which overcharged the government by $9. Convicted of sixty-five separate violations of the federal false claims statute, 18 U.S.C. § 287, the defendant was sentenced to two years imprisonment and fined $5000. Following his criminal conviction, the government brought a successful civil action against the defendant under 31 U.S.C. § 3729, which provided for a $2000 penalty for each violation. Emphasizing the case-specific nature of its inquiry, the *Halper*

[15] The defendant's attack on the recoupment of $450,000 is not based on the amount recouped but on the department's motive for recouping the funds. The defendant maintains that the department recouped the funds in response to pressure from the New England Health Care Employees Union District 1199 and that, therefore, the department's objective was to punish the defendant. The trial court made a factual finding, however, that the defendant had "not met [the] burden of showing that the [recoupment] was in any way affected by the union pressure or demand." That finding is supported by the record and is not clearly erroneous. *State* v. *Geisler*, supra, 222 Conn. 672. Furthermore, the defendant's argument that the fact that the department recouped the entire $420,000 at one time, rather than over the course of several months, indicates that the department's objective was to punish the defendant is a conclusory allegation. Because we conclude that the record lacks the factual basis necessary for us to find, as a matter of law, that the department's motive was punitive, we do not address the issue of whether agency motive is relevant to whether agency action constitutes punishment for purposes of double jeopardy.

court found that the $130,000 civil award was punitive because it was "overwhelmingly disproportionate" to the government's actual loss. *United States* v. *Halper*, supra, 449.

Unlike the sanction at issue in *Halper*, the department's recoupment of $450,000 from Winthrop was not punitive. While the amount recovered exceeds the amount of overpayments caused by the defendant's allegedly fraudulent cost reports; see footnote 10 of this opinion; the disparity, even if not attributed to recoupment of other apparent overpayments, is not great enough to alter the character of the department's action. "[T]he Government is entitled to rough remedial justice, that is, it may demand compensation according to somewhat imprecise formulas . . . without being deemed to have imposed . . . punishment for the purpose of double jeopardy analysis." Id., 446. "Leeway is given to achieve 'rough justice' when computing the precise amount of damages and costs the government suffered." *United States* v. *Morgan*, 51 F.3d 1105, 1115 (2d Cir. 1995). The amount recovered from Winthrop falls within the bounds of rough justice and is not disproportionate to what the government suffered in damages and expenses and, consequently, did not constitute punishment.

Accordingly, because the legislature intended the recoupment provision of § 17b-238 (c) to serve a remedial, rather than punitive, purpose, and because the department's recoupment of $450,000 from Winthrop was not excessive, we conclude that the department's action was not punitive and did not constitute punishment for double jeopardy purposes.

## II

The defendant next claims that the department's action in instructing the receiver not to pay the defendant a salary during the receivership period constituted

punishment for purposes of double jeopardy. We disagree for two reasons.

First, the defendant's claim that the department's instruction to the receiver served no remedial purpose and, therefore, operated as punishment is a conclusory allegation. The record is completely devoid of evidence regarding the purpose of the department's instruction.

Second, in light of the trial court's factual findings and the record, we cannot conclude as a matter of law that, as applied to the defendant, the failure to pay a salary was punitive. The trial court made a finding of fact that during most of the period of receivership, the defendant was under no legal obligation to perform services for Winthrop and simply could have refused to do so. The defendant did, however, have such an obligation during the last weeks of the receivership. That obligation attached when the defendant voluntarily contracted with the department to continue doing Winthrop's accounts receivables without compensation during the pendency of the sale of the facility to a new owner. At the evidentiary hearing, the defendant acknowledged that he agreed to continue to do the accounts receivable because he wanted the facility to continue to operate and provide services to its residents.[16] Because there is no evidence that the defendant was legally entitled to a salary, we cannot conclude as a matter of law that the failure to pay one was punitive.

Because the record is insufficient as a matter of law to support a conclusion that the department's action was punitive in purpose or as applied to the defendant,

---

[16] At the evidentiary hearing, the defendant also acknowledged that the department believed that the only way it could ensure recovery of state funds it advanced to the receiver for the purpose of keeping the facility operating during the pendency of the sale to a new owner was to require the defendant to do the billing. At oral argument, the defendant conceded that he had obtained a higher price for the facility than he would have had it not been in operation at the time of the sale.

we determine that the trial court properly concluded that the failure to pay him a salary in the weeks preceding the closing of the sale of the Winthrop facility did not constitute punishment for double jeopardy purposes.

### III

The defendant further maintains that the restrictive covenant in the medicaid contract forbidding Winthrop's new owner from doing business with the defendant constituted punishment for purposes of double jeopardy. We disagree.

The record is devoid of evidence of punitive departmental purpose and of evidence that the new owner otherwise would have conducted business with the defendant. Because the record is insufficient as a matter of law to support a conclusion that the restrictive covenant in the contract was punitive in purpose or as applied, we determine that the trial court's conclusion that it did not constitute punishment was proper.

We conclude, therefore, that under the fifth and fourteenth amendments to the United States constitution, none of the three actions taken by the department constituted punishment for purposes of double jeopardy. The legislature intended recoupment to serve a remedial, rather than punitive, purpose, and the amount recouped from the defendant was not punitive. In addition, there is no evidence that either the withholding of salary from the defendant or the restrictive covenant in the medicaid contract with the new owner was punitive in purpose or in application to the defendant.

### IV

We turn now to the defendant's state constitutional claim. The defendant maintains that the state constitution provides broader protection against double jeopardy than does the federal constitution. In particular, the defendant argues that if an administrative sanction

is not *exclusively* remedial, it constitutes punishment for purposes of state constitutional double jeopardy analysis.

When determining whether our state constitution affords Connecticut citizens greater individual liberties than does its federal counterpart, we consider, to the extent applicable, six factors: (1) the text of relevant constitutional provisions; (2) historical insights into the intent of our constitutional forebears; (3) related Connecticut precedents; (4) persuasive federal precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms. *Washington* v. *Meachum*, 238 Conn. 692, 716, 680 A.2d 262 (1996); *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). None of those factors supports the defendant's argument.

First, our state constitution does not contain an express prohibition against double jeopardy. Accordingly, the constitutional text does not support the defendant's argument.

Second, while we have held that the due process clause of article first, § 9, impliedly incorporates a common-law double jeopardy prohibition; *Kohlfuss* v. *Warden*, 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962); the absence of an explicit constitutional double jeopardy provision strongly suggests that the incorporated common-law double jeopardy protection mirrors, rather than exceeds, the federal constitutional protection.

Third, nothing in any of the Connecticut cases cited by the defendant undermines that suggestion. In *Brazo* v. *Real Estate Commission*, 177 Conn. 515, 525–27, 418 A.2d 883 (1979), we determined that because administrative suspension of the plaintiff's real estate broker's license was "penal in nature," the "rule against multiplicity" prohibited multiple suspensions for a single vio-

lation. The authorities cited in support of the "rule against multiplicity" are federal, rather than state, materials. Moreover, there is nothing to indicate that our conclusion that the sanction was penal was based on the fact that it was not solely remedial. The case just as plausibly can be read to indicate that the sanction served a purely punitive purpose.

The defendant's reliance on our characterizations of administrative suspension of various licenses as "penal" in *Fitzpatrick's, Inc.* v. *Commissioner of Motor Vehicles*, 165 Conn. 416, 419, 334 A.2d 476 (1973) (automobile dealer's license), *Dental Commission* v. *Tru-Fit Plastics, Inc.*, 159 Conn. 362, 365, 269 A.2d 265 (1970) (dental license), and *Mack* v. *Saars*, 150 Conn. 290, 294–95, 188 A.2d 863 (1963) (optometry license) is similarly misplaced. There is nothing in any of those cases to indicate that those characterizations, which were made for statutory construction purposes and not for double jeopardy purposes, were based on determinations that the suspensions were not purely remedial. Thus, relevant Connecticut precedent undercuts, rather than supports, the defendant's argument.

Fourth, relevant federal precedent also undermines his position. While, at the time *State* v. *Hickam*, supra, 235 Conn. 614, was decided, there was some controversy as to the effect of language in *United States* v. *Halper*, supra, 490 U.S. 435, suggesting that a sanction whose purpose is not purely remedial must be construed as punitive, in *United States* v. *Ursery*, 518 U.S. 267, 284–85 n.2, 116 S. Ct. 2135, 135 L. Ed. 2d 549 (1996), the United States Supreme Court, concluding as we did in *Hickam* that the language in question, which contradicts the *Halper* court's explicit holding, was dictum, declined to adopt that rule. *State* v. *Hickam*, supra, 623.

Fifth, the defendant has not cited, and we are unaware of, any case in which a sister state has adopted

the "solely remedial" standard as a matter of independent state constitutional law.

Sixth, the "solely remedial standard" clashes with long-standing judicial acceptance of parallel administrative and criminal proceedings. See, e.g., *United States ex rel. Marcus* v. *Hess*, 317 U.S. 537, 554, 63 S. Ct. 379, 87 L. Ed. 443 (1943). "It is hard to imagine a sanction that has no punitive aspect whatsoever." *United States* v. *Ursery*, supra, 518 U.S. 284–85 n.2. Noting that under the proposed standard, a sanction that exhibits even a "minuscule deterrent or retributive purpose" would constitute punishment, in *Hickam* we explicitly rejected, in the context of the federal double jeopardy protection, the standard advocated by the defendant. *State* v. *Hickam*, supra, 235 Conn. 620, 623. Adoption of the "solely remedial" standard would force the state to choose between administrative sanction and criminal prosecution. A standard that prevents the state from seeking criminally to punish conduct that adversely affects the public interest because it has taken administrative action to ameliorate the harm occasioned by that conduct would be an unworkable economic and sociological policy.

Accordingly, we decline to adopt the "solely remedial" standard proposed by the defendant. Sanctions that are not exclusively remedial do not necessarily constitute punishment for state constitutional double jeopardy purposes.

The trial court's denial of the defendant's motion to dismiss is affirmed.

In this opinion the other justices concurred.