## IN RE SHANE P.*
(AC 19430)

O'Connell, C. J., and Lavery and Landau, Js.[1]

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 18—officially released June 13, 2000

*Raymond J. Rigat,* for the appellant (respondent father).

*Mary K. Lenehan,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney

general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*David T. Stone,* for the minor child.

LAVERY, J. The respondent father[2] appeals from the judgment of the trial court terminating his parental rights with respect to his minor child, Shane P. He claims that (1) the court's finding that he abandoned Shane constituted an unconstitutional deprivation of due process, (2) the court improperly found that he failed to achieve sufficient personal rehabilitation, (3) the statutory grounds of abandonment and failure to achieve rehabilitation pursuant to General Statutes (Rev. to 1997) § 17a-112, as bases for the termination of parental rights, are unconstitutionally vague as applied to him, (4) the court's finding of abandonment violated the double jeopardy clause of the fifth amendment to the United States constitution and (5) the termination of his parental rights constituted a violation of due process. We affirm the judgment of the trial court.

In a memorandum of decision, filed February 4, 1999, the court found the following facts. The respondent dropped out of high school and developed a drug and alcohol habit. He married Shane's mother in 1986, and the couple in 1988 had their first child, B. The respondent introduced his wife to drugs, and she also became addicted. In 1991, after a series of arrests, the respondent and his wife put B in the care of his maternal grandparents, where he has remained. Despite their inability to care for B, the respondent and his wife in 1992 had another son, J. Two years later, the respondent and his wife left J with his maternal grandparents as a

---

[2] The trial court terminated the parental rights of both respondent parents. In this opinion, we address only the appeal by the respondent father and refer to him as the respondent.

result of the persistent marital, drug and criminal justice problems the respondent and his wife experienced.

Shane was born prematurely on July 31, 1995, with a positive toxicity for opiates and went through withdrawal. The presence of drugs in Shane may have been due to his mother's methadone treatment, although she admitted to using cocaine early in her pregnancy.

On October 3, 1995, with his wife, Shane and J in a car with him on a dirt road, the respondent smoked rock cocaine and then assaulted police officers who came to the scene. Cocaine and baby formula were found in the car. As a result, the respondent was convicted of multiple counts of risk of injury to a child, possession of narcotics and assault on a police officer. Due to the severity of the incident, as well as his lengthy criminal record, which included eight prior felony convictions, violation of probation and numerous misdemeanors, the respondent received a total effective sentence of ten years, execution suspended after five years in prison, and five years of probation. He remains in prison with a maximum release date of October, 2000. The respondent's wife was convicted of risk of injury to a child and received a suspended sentence. Subsequently, however, in connection with an unrelated incident, she was convicted of robbery, risk of injury to a child and assault in the second degree for which she received a total effective sentence of seven years incarceration. Her maximum release date is June, 2004.

On the basis of the October, 1995 incident, the commissioner of children and families (commissioner) obtained an order of temporary custody for J and Shane. The commissioner placed the boys in a foster home,[3] where Shane has remained. On June 10, 1996, the court adjudicated Shane neglected. The court has extended

[3] In the foster home, J threw toys at Shane and did not get along with the other boys there. The department of children and families returned J to his maternal grandparents.

his commitment to the commissioner until June 10, 2000.

From birth, Shane has had special needs. In the first several months of his life, Shane exhibited severe back arching, body tremors, unusual screaming and difficulty keeping down his formula. At twenty-two months, Shane was diagnosed with developmental weaknesses and inconsistencies in the areas of language development, neuromotor functions, behavioral control and possible learning disability. Through the hard work of his foster mother, Shane was placed in a newly created special education program. Although Shane has improved in many areas, he still has frustration problems, oral motor difficulties and is prone to choking.

Shane's foster mother is devoted to him and devotes considerable energy to his development. A pediatrician and psychologist who testified at the respondent's trial complimented the foster mother as committed and understanding. Complaints by the respondent's wife regarding the foster mother's care were investigated and shown to be unsubstantiated. Shane's foster parents love him and would like to adopt him. Shane is quite comfortable and is thriving in his foster environment. Shane refers to the other boys in the foster household as his brothers. He refers to his biological brothers, B and J, as his friends. Shane refers to his foster parents as mommy and daddy. Shane does not look forward to visits with the respondent or his wife.

After his arrest in October, 1995, the respondent did not, until February, 1996, request that the department of children and families (department) facilitate a visit with Shane. Sporadic requests continued until August, 1997, when the respondent had his first prison visit with Shane. Delays in the department's response to the respondent's requests stemmed from the mixed signals he gave regarding his interest, as well as from the fre-

quent turnover of department social workers assigned to the case. Another visit took place in October, 1997, but Shane was uncomfortable, and the respondent suggested that the visit end early. The respondent did not request more visits until March, 1998. The respondent has not sent Shane Christmas or birthday cards or presents. The respondent also admitted that Shane does not know him as a father. Indeed, Shane does not refer to the respondent as daddy or any similar term.

The court found by clear and convincing evidence that the respondent had abandoned Shane within the meaning of § 17a-112 (c) (3) (A) because the respondent had no contact with the child during a five month period between October, 1995, and February, 1996, and showed only sporadic interest in him thereafter. The court also found that for more than one year the respondent had failed to achieve sufficient personal rehabilitation, within the meaning of § 17a-112 (c) (3) (B), such that it is likely that within a reasonable time he could assume a position of responsibility in the child's life. The court then determined that it was in Shane's best interest to terminate the respondent's parental rights. Finally, the court denied a motion by the respondent's wife to transfer guardianship of Shane to his maternal grandparents. This appeal followed.

At the outset, we note our standard of review in termination of parental rights cases. "The standard for review on appeal [in a termination of parental rights case] is whether the challenged findings are clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in

favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Alissa N.*, 56 Conn. App. 203, 207, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000).

## I

## A

The respondent contends that the court's finding of abandonment was an unconstitutional deprivation of due process because five months of no contact with Shane does not constitute abandonment, and the failure of the department to arrange prison visitation was the main cause of the lack of contact.[4] Although the respondent in his brief does discuss his actions with regard to Shane, he provides no analysis in support of his allegation of a due process violation. Accordingly, this claim is inadequately briefed and we deem it abandoned. *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 300, 589 A.2d 337 (1991); *State* v. *Dumas*, 54 Conn. App. 780, 794, 739 A.2d 1251, cert. denied, 252 Conn. 903, 743 A.2d 616 (1999).

What the respondent does brief is a challenge to the sufficiency of the evidence underlying the court's conclusion that clear and convincing evidence exists that he abandoned the child within the meaning of § 17a-112 (c) (3) (A).

"Abandonment focuses on the parent's conduct. It is a question of fact for the trial court which has the parties before it and is in the best position to analyze all of the factors which go into the ultimate conclusion

---

[4] In its memorandum of decision, the court stated: "The court can waive the requirement that a statutory ground exist for more than one year if it finds '[f]rom the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child. . . .' General Statutes (Rev. to 1997) § 17a-112 (d) (1). To the extent that the father's abandonment was less than one year, the court waives the one year requirement."

that [the statutory standard of abandonment] has been satisfied." (Internal quotation marks omitted.) *In re Drew R.*, 47 Conn. App. 124, 128, 702 A.2d 647 (1997).

"It is not lack of interest alone which is the criterion in determining abandonment. Abandonment under [§ 17a-112 (c) (3) (A)] requires failure to maintain interest, concern or responsibility as to the welfare of the child. Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred. . . . General Statutes [§ 17a-112 (c) (3) (A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) Id., 129.

The court stated in its memorandum of decision: "The father abandoned Shane between his arrest in October, 1995, and his request for a visit in February, 1996, a five month period. Over the next year, the father made several direct and indirect requests for visits, and [the department] failed to respond. In February, 1997, however, the father expressed ambivalence concerning whether he wanted a visit. After a March, 1997 request for a visit by the paternal grandparents on [the respondent's] behalf, the father visited Shane in August and October, 1997. At the October visit, the father again exhibited some ambivalence and then failed to request another visit until five months later in March, 1998. At no point has the father recognized Christmas or Shane's birthday . . . . On the whole, the court finds that the

father's level of interest in his son was sporadic, which is not sufficient to defeat statutory abandonment."

On the basis of our review of the court's factual findings, we conclude that the evidence was sufficient to support the determination that the respondent abandoned Shane.

B

The respondent also contends that the court's finding that he failed to achieve sufficient personal rehabilitation was clearly erroneous. For the reasons set forth below, we need not and do not decide this claim.

In part I A of this opinion, we concluded that the court properly found that the respondent abandoned Shane. We need only uphold one statutory ground found by the court to affirm its decision to terminate parental rights. *In re John G.*, 56 Conn. App. 12, 20 n.4, 740 A.2d 496 (1999). "To prevail on [his] claim that the court improperly terminated [his] parental rights, the respondent must successfully challenge all of the bases of the judgment terminating [the] parental rights. If [any] of the grounds on which the trial court relied are upheld on appeal, the termination of parental rights must stand." (Internal quotation marks omitted.) Id. Accordingly, because one statutory ground for termination properly exists, namely abandonment, we need not reach the respondent's claim that the court's finding that he failed to achieve personal rehabilitation was clearly erroneous.

II

The respondent also contends that the statutory ground of abandonment pursuant to § 17a-112 (c) (3) (A) is unconstitutionally vague as applied to him because it fails to put an incarcerated parent on notice as to what is expected to prevent termination of paren-

tal rights.[5] We disagree and conclude that the statute and our case law provided more than sufficient guidance to the respondent.

"The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution." *Packer* v. *Board of Education*, 246 Conn. 89, 98, 717 A.2d 117 (1998). The doctrine requires statutes (1) to provide fair notice of the conduct they address and (2) to establish minimum guidelines to govern law enforcement. *State* v. *Indrisano*, 228 Conn. 795, 802, 640 A.2d 986 (1994). Since the "minimum guidelines" prong is applicable only where a statute is challenged as being unconstitutional on its face; *State* v. *George*, 37 Conn. App. 388, 390 n.2, 656 A.2d 232 (1995); and the respondent did not make a facial challenge, we focus our attention on the first requirement.

Because the respondent's vagueness claim was not raised in the trial court, he now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Our Supreme Court has held that a party can prevail on a claim of constitutional error not preserved at trial only if all of the following four conditions are satisfied: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id.

[5] The respondent also challenges the statutory ground of failure to rehabilitate as unconstitutionally vague as applied to him. General Statutes (Rev. to 1997) § 17a-112 (c) (3) (B). Because we affirm the court's conclusions on the abandonment ground; see *In re John G.*, supra, 56 Conn. App. 20 n.4; we need not consider this challenge.

*Golding* applies to civil as well as criminal cases. *In re Shyliesh H.*, 56 Conn. App. 167, 178, 743 A.2d 165 (1999); *Hurtado* v. *Hurtado*, 14 Conn. App. 296, 300, 541 A.2d 873 (1988). Even if we assume that the respondent has met the first two prongs of *Golding*, the respondent has failed to meet the third requirement of *Golding*, i.e., that a constitutional violation clearly exists and clearly deprived him of a fair trial.

"Legislative enactments carry with them a strong presumption of constitutionality, and a party challenging the constitutionality of a validly enacted statute bears the weighty burden of proving unconstitutionality beyond a reasonable doubt. *State* v. *Angel C.*, 245 Conn. 93, 102, 715 A.2d 652 (1998). In analyzing the constitutionality of a statute, the court will 'read the statute narrowly in order to save its constitutionality, rather than broadly in order to destroy it.' *State* v. *Indrisano*, [supra, 228 Conn. 805]." *In re Shyliesh H.*, supra, 56 Conn. App. 178.

Simply put, the respondent received ample guidance so that he could appraise what was necessary to avoid a finding of abandonment. "A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions, nor is it necessary that a statute list the exact conduct prohibited. . . . The constitution requires no more than a reasonable degree of certainty." (Citations omitted.) *Packer* v. *Board of Education*, supra, 246 Conn. 101.

High standards of precision in the parental termination arena are neither achievable nor desired, as the acceptability of specific conduct and the determination of whether to terminate parental rights is a highly fact-specific process. See *State* v. *Anonymous*, 179 Conn. 155, 165, 425 A.2d 939 (1979). "In light of the individualistic nature of each case, § 45a-61f (2) [an analog to

§ 17a-112] is, on its face, precise enough to warn parents what is and what is not acceptable conduct." Id.

Since our Supreme Court's pronouncement in *State v. Anonymous*, supra, 179 Conn. 155, more than twenty years ago, our state's appellate case law has further shaped and circumscribed the meaning of abandonment. "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [§ 17a-112 (c) (3) (A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . .

"Section 17a-112 [(c) (3) (A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern. . . .

"The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . . *In re Kezia M.*, [33 Conn. App. 12, 17–18, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993)]." (Internal quotation

marks omitted.) *In re John G.*, supra, 56 Conn. App. 20–21; see also *In re Roshawn R.*, 51 Conn. App. 44, 53, 720 A.2d 1112 (1998).

Guidance also exists for an incarcerated parent. Our case law has noted that a parent's incarceration does not absolve him of the requirement that he maintain contact with his child. Although a parent's imprisonment alone does not constitute abandonment; *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 443, 446 A.2d 808 (1982); "[t]he restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited, resources for communication with [his child]." *In re Shannon S.*, 41 Conn. Sup. 145, 153, 562 A.2d 79, aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989). A parent's interest in his child must not merely be sporadic in nature, but must exist on a consistent and continuing basis. See *In re Migdalia M.*, 6 Conn. App. 194, 210, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).

We conclude that § 17a-112 (c) (3) (A) is not void for vagueness as applied to the respondent. This provision as written and as interpreted in our case law provides fair warning of the conduct necessary to avoid a finding of abandonment. The respondent has failed to meet the third *Golding* requirement that a clear constitutional violation exists, and his claim therefore must fail.

III

The respondent next argues that the court's finding that he abandoned Shane violated the double jeopardy clause of the fifth amendment to the United States constitution because the termination of his parental rights punished him for his status as an incarcerated parent. We disagree.

Because this claim was not preserved at trial, we review it under the precepts of *State* v. *Golding*, supra,

213 Conn. 239–40. "The double jeopardy clause of the fifth amendment to the United States constitution provides that no person shall be subject for the same offense to be twice put in jeopardy of life or limb." (Internal quotation marks omitted.) *State* v. *Braswell,* 42 Conn. App. 264, 268, 679 A.2d 407 (1996), appeal dismissed, 243 Conn. 248, 701 A.2d 1057 (1997). "In order for double jeopardy to exist there must be a dual punishment of the same offense arising out of the same act." *State* v. *Garvin,* 43 Conn. App. 142, 150, 682 A.2d 562 (1996), aff'd, 242 Conn. 296, 699 A.2d 921 (1997).

A civil sanction, however, "that serves a legitimate remedial purpose and is related rationally to that purpose does not give rise to a double jeopardy violation even if the sanction has some deterrent effect." *State* v. *Hickam,* 235 Conn. 614, 623, 668 A.2d 1321 (1995), cert. denied, 517 U.S. 1221, 116 S. Ct. 1851, 134 L. Ed. 2d 951 (1996). "[A] civil sanction constitutes punishment when the goal it serves is for purposes of deterrence or retribution. Such goal is evidenced when the sanction is overwhelmingly disproportionate to the damages caused. See *United States* v. *Halper,* 490 U.S. 435, 448–49, 109 S. Ct. 1892, 1901–02, 104 L. Ed. 2d 487 (1989). Thus, an overwhelmingly disproportionate sanction may be present where the civil sanction bears so little relationship to making the government whole as to shock the conscience of the court." *United States* v. *Morgan,* 51 F.3d 1105, 1108 (2d Cir.), cert. denied, 516 U.S. 861, 116 S. Ct. 171, 133 L. Ed. 2d 112 (1995).

When considering whether a civil sanction is characterized as remedial for the purposes of the double jeopardy clause, we take a two-pronged approach. "Under that approach . . . [the court must] assess: (1) the purpose the sanction is designed to serve; and (2) the nature of the particular sanction as applied to the defendant." *State* v. *Tuchman,* 242 Conn. 345, 352, 699 A.2d 952 (1997), cert. dismissed, 522 U.S. 1101, 118 S. Ct.

907, 139 L. Ed. 2d 922 (1998); *State* v. *Duke*, 48 Conn. App. 71, 76 n.9, 708 A.2d 583, cert. denied, 244 Conn. 911, 713 A.2d 829 (1998).[6]

As to the first prong, the purpose of the "sanction" of terminating an individual's parental rights clearly is remedial in nature. General Statutes § 17a-101 (a) highlights the public policy of this state as it pertains to children: "To protect children whose health and welfare may be adversely affected through injury or neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family."

Our case law has articulated similar remedial purposes. "The primary concern of [the department] is the safety of [the child]. . . . Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings." (Internal quotation marks omitted.) *In re Christine F.*, 6 Conn. App. 360, 368, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986); see also *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 352, 488 A.2d 790 (1985)

---

[6] "Among the factors that are indicative of whether a sanction is punitive or remedial in nature are whether (1) it involves an affirmative disability or restraint, (2) it has historically been regarded as a punishment, (3) it comes into play only on a finding of scienter, (4) its operation will promote the traditional aims of punishment, i.e., retribution and deterrence, (5) the behavior to which it applies is already a crime, (6) an alternative purpose to which it may rationally be connected is assignable for it, and (7) it appears excessive in relation to the alternative purpose assigned. *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963)." *State* v. *Duke*, supra, 48 Conn. App. 75.

(established public policy of state is to protect children); *State* v. *Anonymous*, supra, 179 Conn. 171 (same). There simply is no evidence to indicate that the termination of the respondent's parental rights occurred for any reason but the remedial purpose of protecting the welfare of his son, Shane.

We conclude that the application of § 17a-112 to the respondent does not violate the double jeopardy clause. As stated in our case law, the legislature intended § 17a-112 to serve a remedial purpose—to protect the welfare of children in our state—and it served that purpose when the court applied it in the circumstances of this case. Other states faced with double jeopardy challenges to parental termination actions similarly have concluded that because their parental termination statutes are remedial in nature and rationally related to a legitimate governmental purpose, the termination of the parental rights of an incarcerated parent does not signify an additional punishment constituting double jeopardy. See, e.g., *Matter of M.B.*, 666 N.E.2d 73, 79–80 (Ind. App. 1996); *In re Interest of Theodore W.*, 4 Neb. App. 428, 440–41, 545 N.W.2d 119 (1996).

The court's conclusion that the respondent abandoned Shane did not violate the double jeopardy clause of the United States constitution. Accordingly, even if we assume arguendo that the first two prongs of *Golding* have been met, the respondent again has failed to meet the third requirement, i.e., that a constitutional violation clearly exists. Therefore, his claim must fail.

IV

The respondent argues that the termination of his parental rights constituted a violation of due process. He posits that the court failed to demonstrate a compelling state interest in terminating his parental rights when the alternative of placing Shane with his maternal grandparents was available, and would have reunited

Shane with his brothers and kept him within the custody of his natural family. After applying the *Golding* standard of review to this unpreserved constitutional claim, we disagree.

Our Supreme Court, in addition, has recognized the state's "continuing parens patriae interest . . . in the well being of children . . . ." *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318–19, 460 A.2d 1277 (1983). "It is indisputable that protecting the physical and psychological well-being of children is a compelling, as well as legitimate, state interest." *State* v. *Palangio*, 24 Conn. App. 300, 304, 588 A.2d 644, cert. denied, 218 Conn. 911, 591 A.2d 813 (1991). "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens . . . ." *Prince* v. *Massachusetts*, 321 U.S. 158, 168, 64 S. Ct. 438, 88 L. Ed. 645 (1944). In this case, the state has a compelling interest in assuring the physical and psychological well-being of Shane, a child born with special needs who requires extraordinary care from a dedicated, loving parent.

The respondent's argument that no showing of a substantial degree of harm to Shane exists because guardianship could have been granted to the child's maternal grandparents is highly dubious. Transferring guardianship would have required the following. First, Shane would have to be separated from a foster mother and father who are dedicated to meeting his special needs, with whom Shane has bonded and whom he calls mommy and daddy. Then, Shane would have to be transferred, almost certainly against his wishes, into a home with biological siblings to whom he refers as no more than friends and with biological grandparents to whom he refers as no more than J's grandparents, who did not recognize Shane's past birthdays and do not currently inquire into his well-being at his foster home.

Furthermore, Shane no longer would live with foster siblings he cares about and gets along with in his foster home. Instead, he would live with two biological brothers he hardly knows who are receiving counseling for behavior difficulties. Shane actually may fear one of those brothers, J, due to J's aggressive behavior toward Shane earlier in childhood. Finally, if the maternal grandparents were to receive guardianship of Shane, they would, upon the release of Shane's mother from prison, return him to his mother, who similarly has shown questionable responsibility toward him.

Shane would also lose any sense of permanency that he has in his present home. Residence with Shane's maternal grandparents would serve at best as little more than yet another transitional domicile until his mother is released from prison. Our Supreme Court's discussion of a matter where a child was left by the state to wander through transitional custody proves instructive: "It is shocking that the defendant's children have been in 'temporary' custody for more than three years. This is a tragic and deplorable situation, and [the department] must bear full responsibility for this unwarranted and inexcusable delay. Too often the courts of this state are faced with a situation where, as here, litigation has continued for years while the children, whose interests are supposed to be paramount, suffer in the insecurity of 'temporary' placements. The well-known deleterious effects of prolonged temporary placement on the child, which we have discussed above, makes continuing review by [the department] of all temporary custody and commitment cases imperative. Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings." *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 292, 455 A.2d 1313 (1983).

Forcing a child back into a potentially unhealthy and far less supportive atmosphere merely for the sake of having the child live in the same dwelling as relatives does not provide a constitutionally required alternative for Shane's family placement. The presence of a compelling interest in terminating the respondent's parental rights is not diluted merely because a relative demands custody. The respondent again has failed to meet the third *Golding* requirement that a constitutional violation clearly exists. Therefore, his claim must fail.

The judgment is affirmed.[7]

In this opinion the other judges concurred.

---

[7] The petitioner, the commissioner of children and families, argued on appeal that the court improperly concluded that it could not find a lack of an ongoing parent-child relationship between the respondent and Shane due to the respondent's incarceration. Because we affirm the judgment on the ground of abandonment, we need not reach this issue. See *In re John G.*, supra, 56 Conn. App. 20 n.4.

