MEMORANDUM OF DECISION
On March 1, 2000, The Department of Children and Families, hereafter DCF, filed co-terminous petitions of neglect and termination of the parental rights of the respondent mother, Deborah B. and the respondent father, John Doe to Daymond W., a child born on January 2000. On November CT Page 8158 20, 2000, DCF filed a motion to amend the termination of parental rights petition, which was granted on December 15, 2000.[2]
On January 17, 2001, DCF filed a motion for a determination that reasonable efforts to reunify Daymond with his biological mother were no longer appropriate. On January 18, 2001, the court, Quinn, J.,
consolidated this motion with the co-terminous trial. The trial was held on March 22 and March 23, 2001. DCF proceeded on the neglect grounds that the child had been abandoned, is being denied proper care and attention, physically, educationally, emotionally or morally and is being permitted to live under conditions injurious to his well being. The termination petition alleges abandonment by the father and no ongoing parent-child relationship between the father and the child. In addition, the petition alleges pursuant to Connecticut General Statute § 17a-112 (j)(3)(E) that the child, who is neglected or uncared-for, is under the age of seven years, that his mother has had her rights terminated as to other children and that she has failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. DCF also alleges that mother abandoned the child in the sense that she has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child and that mother has committed acts of omission and commission. Connecticut General Statutes § 17a-112 (j)(3)(A) and (C).
The court finds that the mother and the father were provided notice of the proceedings in accordance with the practice book and that this court has jurisdiction. The court further finds that mother appeared and has a court appointed attorney. The identity of the biological father is unknown. An affidavit of diligent search to identify and locate the father was filed with the court. No one claiming to be the father of Daymond has come forward during the pendency of this matter. The court finds that there was proper publication of notice of the proceedings to the unknown father, using the customary appellation of "John Doe".
The court heard testimony from five DCF social workers, one DCF nurse practitioner and the foster mother. In addition, the court was presented with thirty-three full exhibits. The evidence offered at trial, as interpreted in the light of the prior record in this court concerning Daymond, and judicial notice taken of all court action which affected him and his siblings support the following findings of fact.
1. FACTS
 A. Events Prior to the Filing of the Neglect and Termination Petitions. CT Page 8159
In addition to Daymond, Deborah has given birth to four other children; D., now 13 years old, T., 12 years old, J., 11 years old, and Th., now 2 years old. Deborah's parental rights to T., her 12-year-old daughter, were terminated on May 19, 1993. J. is committed to DCF and guardianship of Deborah's oldest child, D., was transferred to his aunt, with whom this child still resides. The only child presently in the care and custody of Deborah is two-year-old Th.
The mother, Deborah is thirty-one years old. She suffered a major loss at the age often, when her mother died. She then moved in with her grandmother, who became her primary caretaker. She dropped out of school in the ninth grade, at eighteen years of age, after becoming pregnant with her first child, D. She remained in her grandmother's home until after the birth of her second child, T. Nineteen months later, she moved out on her own. It is after leaving her grandmother's home that Deborah's odyssey into the world of transient living commenced. Her entry into independent living is marked first by a stay at a homeless shelter, where she remained for a brief period, and then in the various homes of friends and family. She currently lives in an apartment of her own with her two-year-old son, Th.
Deborah first came to the attention of DCF in 1991, when an unrelated caretaker brought T., her second born child, to a hospital emergency room. The caretaker informed the hospital that the child had been left in her care by Deborah, from shortly after her birth in 1988 until December 1990. Deborah returned to the caretaker twenty-four months after leaving the child with her, and took custody of T. On February 15, 1991, just several months after being in Deborah's care, DCF received a referral from a hospital concerning T.'s physical condition. The child's physical and medical status were such that she was admitted to the hospital for immediate treatment. DCF invoked a ninety-six hour hold and placed the child in foster care. Deborah's parental rights to T. were terminated on May 19, 1993 and T. has been adopted.
It was two months after the ninety-six hour hold was issued regarding T., on April 12, 1990, that Deborah delivered her third child, J. This child resided with mother during the first years of his life. DCF received several referrals concerning the abuse and neglect of J., all but one of which were substantiated. On one occasion in July 1997, J. was removed from his mother's care pursuant to an order of temporary custody. He remained out of his mother's care until January 1998, when he was returned to her.
On November 4, 1998, J. was adjudicated a neglected child and placed under a three-month order of protective supervision. Deborah was provided CT Page 8160 with specific steps to take to retain custody of J., and to ensure his safety and care. On April 14, 1999, two months after the expiration of the period of protective supervision, DCF received another referral from a hospital stating that J. was in serious need of immediate medical treatment and mother was not cooperating with the treatment. J. was threatening to commit suicide and his condition was critical. DCF once again invoked a ninety six-hour hold, obtained an order of temporary custody and on May 27, 1999 J. was committed to DCF and placed in a residential facility where he remains.
Phyllis Powell-Hodgkins, the DCF social worker assigned to this family in 1991, testified that DCF was never involved with Deborah's first-born child, D. This child was born in 1987 and Deborah agreed to the transfer of D.'s guardianship through Probate Court prior to her involvement with DCF in 1991. As a result, this child was not in her care at the time that mother first came to the attention of the Department.
Ms. Powell-Hodgkins further testified that her efforts to assist Deborah were concentrated on the issues of substance and alcohol abuse as well as a lack of adequate housing. During the time that she worked with the family, referrals were made to various service providers with the expectation that Deborah would successfully address the issues that were causing turmoil in her life. It was the goal of DCF at the time to reunite Deborah and T., her daughter. However, all of the efforts were unsuccessful, in that the court ultimately terminated Deborah's parental rights to T. in 1993.
The court also heard from Tawaina Johnson, the DCF social worker assigned to the family from August 1998 through December 1999. Ms. Johnson testified that she became involved with the family after J. had been returned to his mother under an order of protective supervision. She was working with Deborah around the issues of substance abuse and domestic violence. In addition, she monitored Deborah's compliance with J.'s treatment needs. Ms. Johnson reported and the court finds credible, that Deborah was inconsistent with taking J. to his appointments with the Child Guidance Clinic.
On February 8, 1999, Deborah gave birth to her fourth child, Th. Because mother is suffering from a life threatening illness, Th. was born exposed to this illness also. While she attended to the needs of this newborn, the evidence indicates that J.'s behavior was deteriorating. He was acting out at school and becoming increasingly aggressive. J. remained in his mother's home until April 14, 1999 when he was admitted to Yale-New Haven Hospital with suicidal ideation. The hospital diagnosed J. with Post-Traumatic Stress Disorder and Severe Family Dysfunction after he reported having sustained physical abuse by Deborah's live in CT Page 8161 boyfriend. The hospital recommended medication to control this behavior. Unable to secure mother's cooperation for treatment purposes, the hospital made a referral to DCF. Once again, one of Deborah's children was the subject of a ninety-six hour hold, an order of temporary custody and subsequently a commitment to DCF.
Unfortunately for J., although his condition improved while he was hospitalized, it still was serious enough to require, upon discharge from the hospital, the services of an intensive, highly structured program in a residential facility. J.'s treatment plan at this facility included a component of family therapy in which Deborah was expected to participate. In order to successfully address and treat the serious issues affecting J., Deborah was required to visit him consistently and to become actively involved in his treatment. Ms. Johnson testified that she personally transported Deborah to visits with her son at the hospital. Deborah was faithful in visiting J. while he was hospitalized, however she has not visited or participated in his treatment while he has been confined to the residential facility. Although the court heard evidence that this facility is at a distance from the mother's home, the court also heard evidence that the DCF social worker offered transportation to mother as she had done to facilitate visits while J. was hospitalized.
Approximately thirteen months after giving birth to Th., on January 2000, Deborah prematurely delivered her fifth child, Daymond, the subject of this petition. Because mother is suffering from a life threatening illness, Daymond, like his sibling Th., was born exposed to the same life threatening illness in utero. Because of his fragile health, Daymond remained in intensive care for four days before being discharged from the hospital. On February 4, 2000, DCF received a referral from a hospital social worker regarding Daymond. The social worker reported that Daymond weighed 1970 grams at birth, about four pounds, three ounces. Because of his illness, Daymond required the consistent application of medication. The hospital informed DCF that Daymond was placed in the Newborn Intensive Care Unit immediately after his birth and he remained there until his discharge on January 10, 2000. Deborah was instructed to return to the hospital clinic with Daymond on January 13, 20, 27 and February 3, 2000. The purpose of the follow-up visits was to monitor Daymond's weight gain and his medication. Deborah failed to take Daymond to any of the medical appointments.
On February 4, in response to the referral, DCF contacted mother and brought mother and Daymond to the hospital. Daymond demonstrated a minimal weight gain. Daymond returned home with his mother on February 4, and mother was once again given strict instructions regarding his diet, medication and follow-up clinic appointments. On February 24, 2000, Daymond was diagnosed with "failure to thrive" and admitted to the CT Page 8162 hospital. When Daymond was ready to be released from the hospital, DCF invoked a ninety-six hour hold and applied to the court for an order of temporary custody. The court, Kochiss-Frankel, J., granted the application on March 2, 2000, and Daymond was placed in foster care, where he has remained. The co-terminous petitions were filed at that time with the application.
Due to Daymond's premature birth and fragile condition, he remained in the hospital for four days after his birth. He was so tiny and delicate that when he was eventually discharged from the hospital, it was with specific instructions regarding the administering of medication to treat his exposure to the life threatening illness. In addition, given his low birth weight, he was required to follow a strict feeding schedule. His progress was to be monitored by the hospital in weekly visits to the clinic where his medication would be adjusted as he gained weight. It was only after this schedule was established that he was discharged into his mother's care.
On February 4, 2001, close to thirty days after his birth, the hospital social worker called DCF to report that Daymond had not been brought back to the hospital for any of his scheduled appointments. This, of course, meant that for close to four weeks, a physician had not checked Daymond's condition. The status of his life threatening condition was unknown, as was his possible weight gain or loss. DCF immediately responded in the form of a home visit. The social worker working with the family at this particular time, Ms. Gina Torres, testified that when she arrived at the mother's home, she was amazed at just how small Daymond appeared. "He was no bigger than a standard size piece of paper." Ms. Torres told mother that she would be taking mother and Daymond to the hospital for an appointment with the physician. Although the doctor expressed concern over Daymond's slight weight gain of only three ounces, the infant was allowed to return home with the mother.
Ms. Torres testified that mother was given a supply of the child's medication, reminded how important the follow up visits were and provided with instructions on the feeding schedule. Ms. Torres further testified that since mother agreed to cooperate with DCF and with all future medical appointments, DCF did not seek an order of temporary custody. Daymond again was examined at the hospital on February 10th and on February 13th. When he was examined on February 23rd, he weighed only 2641 grams and was diagnosed with Failure to Thrive and admitted to the hospital. The hospital made a referral to DCF.
The court heard the testimony of Naveen Hassam, a DCF Nurse Practitioner who responded to the referral. Ms. Hassam's resume' was introduced as a full exhibit and the parties agreed that she was an CT Page 8163 expert in the field of neonatal care with an emphasis on low birth weight and Failure to Thrive babies. Ms. Hassam visited the hospital pediatric unit the day after Daymond was admitted. While at the hospital she performed a cursory examination of the child, and reviewed the medical chart as well as the hospital's written report of suspected abuse and neglect. Ms. Hassam testified that the situation was so critical for the child because he had been exposed to a life threatening illness in utero
and he was on significant medication. Ms. Hassam further testified that although Daymond only showed a weight gain of three hundred grams in six and one half weeks while in his mother's care, he gained 250 grams on his second day in the hospital. She explained that such a dramatic weight gain in such a short period of time meant that the child had the capacity to gain weight if fed properly.
Ms. Hassam described for the court her observations of Deborah's interactions with Daymond while he was at the hospital. She testified that while Deborah held the child and attempted to feed him, she appeared disinterested and disengaged and concentrated on watching television. Deborah did not communicate with the baby, "it looked like [she was performing] a task. She did not hold the baby close to her and she needed a lot of encouragement to feed." Mother would not make any eye contact with Ms. Hassam. When Ms. Hassam asked mother if she had burped the baby she abruptly took the bottle out of the baby's mouth and began burping him without checking if the baby was feeding properly. Ms. Hassam explained the need for in home services to mother, but mother refused the services. This was not the first time that mother refused services in the home. According to hospital records dated January 7, 2001, which were entered as full exhibits by agreement of the parties,[3] mother was difficult to engage, very uncooperative, and not willing to accept services in the home.
B. Post-petition Events in Deborah's Life.
The court also heard the testimony of Ms. Nicole Davis, the social worker who worked with the family from February 2000 through September 2000. She testified that she met Deborah on February 24th at the hospital. She is the social worker who prepared the application for the order of temporary custody, as well as the specific steps ordered by the court. She explained to the court in detail her efforts to secure mother's co-operation to put in-home services in place. She believed that if mother accepted the services of a parent aide and an in-home nurse, the baby could be returned to his home with his mother as opposed to a placement in foster care. Deborah refused the services stating that she had raised other children and she knew what to do. Given mother's consistent refusal of services and Daymond's special needs, as well as Th.'s, DCF obtained an order of temporary custody and placed the child in CT Page 8164 a medically fragile foster home.
At the preliminary ten-day hearing on the order of temporary custody, March 9, mother agreed to comply with court ordered specific steps.[4]
Among other things, mother was ordered to visit with Daymond as often as DCF permits and if a cancellation of a visit became necessary to do so in an appropriate matter. Ms. Davis testified that during the entire time that she had the case, mother only visited with Daymond twice. One visit took place on July 19, 2000 and the other visit took place on August 24, 2000. Both visits went very well. Ms. Davis testified that, after the successful visits, she once again had a conversation with mother about being consistent with her visitations with both J. and Daymond. The need for in-home services was also reviewed and discussed. A plan to establish in-home services was agreed upon.
While Deborah tried to attend to the demands of both Th. and Daymond, J. remained in the residential facility, waiting and hoping to be reunited with his mother. The court heard the testimony of Ms. Nicole Davis, the social worker who worked with this family from February 2000 until September 2000. Ms. Davis testified that she communicated to Deborah the urgency of visiting J. at the facility because the separation from his mother was creating serious emotional distress to her son, J. While adults may understand the stress and difficulties facing a young mother trying to care for two fragile infants in her care, while at the same time attempting to keep visits with a child at a distance from the home; a ten year old in J.'s position does not understand. All he knows is that he wants to go home, that he wants to be with his mother and his mother does not come. Hopefully, his treatment will provide him with relief from his inevitable journey down the road of sadness and loss.
In September 2000, DCF referred mother to a program entitled Empowering Children at Risk, or ECAR. Ms. Davis testified that this program is designed to:
 "Cover a range of things from individual counseling to parenting classes, to, if it was needed, substance abuse counseling. They can help mom get job training. They cover a wide range of things. And mom was in agreement to accept this service and the appointment was set up again at her date what she gave me and time and it was never kept. We set it up twice and both times they were never kept. Service was not able to start . . . she didn't have to go anywhere. On the initial appointment, we came to her. But we weren't able to get in."
CT Page 8165 Ms. Davis further testified that ECAR made four attempts to contact mother at her home during the month of September. All of the efforts to connect ECAR with mother were unsuccessful.
The court also heard testimony from the current social worker, Ms. Stacey Phillips. She first started to work with Deborah in late August 2000, while Ms. Davis still was assigned to the family. Ms. Phillips testified that mother has not called, visited, or inquired about Daymond's condition since she first was assigned the case. Mother has not asked to visit on Daymond's first birthday or on any holiday.
C. Daymond W., the child
Daymond is residing in the home of an unrelated foster family. The foster mother, Mrs. K., testified about the child's current condition. She explained to the court that the child has been in her care since March 7, 2000. She described Daymond as a tiny, beautiful and happy child. When he first came into her care, he was taking medication and was seen by his physician weekly. As his health stabilized and he achieved normal weight gain, the need for such frequent monitoring has decreased.
Daymond, however, continues to be under the care of an immunologist to track his life-threatening illness. He also suffers from a weakness on one side of his body that requires that a physical therapist work with him every other week, and a routine set of home exercises force him to use the weaker side of his body. Daymond also receives the services of a birth to three special education teacher.
Mrs. K testified that she loves Daymond as if he were her own child and wishes to adopt him. She is the biological mother of a nineteen-year-old son who is currently in college. She is also the adoptive mother of a special needs child.
2. NEGLECT ADJUDICATION
 "When coterminous petitions are filed, the judicial authority first determines whether the child is neglected by a fair preponderance of the evidence; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by clear and convincing evidence; if so, then the judicial authority determines whether termination is in the best interests of the child by clear and convincing evidence." Practice Book § 33-12.
DCF alleges in its neglect petition that Daymond is neglected in that CT Page 8166 he has been (1) abandoned, (2) is being denied proper care and attention, physically, educationally, emotionally or morally and (3) is being allowed to live under conditions injurious to the child's well-being. DCF also alleges that Daymond is uncared-for in that his home cannot provide the specialized care which the physical, emotional or mental condition of the child requires.
The court finds, by a preponderance of the evidence, that on December 15, 2000 Daymond was a neglected child, in that his mother abandoned him. By failing to adequately nourish, feed and provide Daymond with the medical attention that he needed to meet his needs during the first month of his life, Deborah also permitted him to live under conditions injurious to his well being. In addition, he was being denied the proper care and attention needed to survive. In addition, the court finds that Deborah's refusal of supportive services as well as her belief that she could adequately care for a child with Daymond's special needs without any outside help, point to her lack of insight and understanding of the serious nature of the child's condition. Even in the face of Daymond's dramatic weight gain in just one day in the hospital, mother continued to refuse services.
From the date DCF invoked a ninety-six hour hold on February 23, 2000 until December 15, 2000, Deborah has visited twice with the child, once on July 19, 2000 and a second time on August 24, 2000. Thus, Daymond is in a position similar to his half sibling J.; having a mother who is emotionally and physically unavailable to meet his many needs. The court finds, by a preponderance of the evidence, indeed by clear and convincing evidence, that on the date of the filing of the petition, Daymond was a neglected child pursuant to Connecticut General Statutes § 46(b)-120 (8).
3. REASONABLE EFFORTS
Connecticut General Statutes § 17a-112 ((j)(1) allows a court to terminate parental rights provided that the court first:
"finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unwilling or unable to benefit from reunification efforts, provided that such finding is not required if the court has determined at a hearing pursuant to subsection (b) or § 17a-110 or § 17a-111b that such efforts are not appropriate . . ." CT Page 8167
In its petition, DCF alleges that it has made reasonable efforts to locate the father. DCF further alleges that it has made reasonable efforts to reunify Daymond with his mother. Additionally, DCF alleges that Deborah is unwilling or unable to benefit from reunification services. As stated previously, an affidavit detailing the DCF effort to identify and locate the father was filed with the court. In addition, the court heard testimony describing the attempts made by DCF to obtain the identity of the father. Mother consistently refused to provide any information concerning the paternity of Daymond. The court finds by clear and convincing evidence that DCF made reasonable efforts to identify and locate Daymond's biological father.
It is clear from the statutory language that DCF is required to make reasonable efforts to reunify mother and child. Neither Connecticut law nor the federal Adoption and Safe Families Act of 1997 (AFSA), from where the requirement emanates, however, define what constitutes reasonable efforts. The evidence in this case demonstrates clearly and convincingly that from the moment DCF received the first referral from the hospital concerning Daymond's lack of follow-up care, reasonable efforts to maintain Daymond in his mother's care were made. Support services were provided to the mother. On February 4, 2000, the day of the initial referral, a DCF social worker immediately came to mother's home and helped her to get both Th. and Daymond dressed and ready to make a sudden trip to the hospital. She then transported the family to and from the hospital. In a further attempt to assist mother to retain Daymond in the home, a parent aide and visiting nurse were offered. Mother refused this service. Following Daymond's admission to the hospital on February 24, 2000, with the hope that Daymond could return home with his mother, rather than become the subject of an order of temporary custody, the in-home support services were once again offered. The services were once again refused. Once Daymond was placed out of his home, visitation coordination and case management services were made available to mother.
In addition, a service known as ECAR was made available to mother. ECAR, Empowering Children at Risk, is a comprehensive service provider that would come to mother's home. As stated earlier in this decision, ECAR covered a full range of services, from individual counseling to parenting classes and, if needed, substance abuse counseling. The undisputed testimony before the court is that ECAR made four attempts to reach mother in her home and each attempt was futile. Mother was either not home for the appointment or she would not open the door.[5]
The challenge for the child welfare system, as it attempts to provide reasonable efforts to reunify parents such as Deborah with their children, is to identify meaningful approaches to engage and keep the CT Page 8168 parent in the services required to accept the need for change in their lives. This is, however, not a one-way street. The challenge for parents is to accept responsibility for the actions that have led them, and unfortunately many of their children, down the path of pain and suffering.
In this case the court finds by clear and convincing evidence, that DCF provided reasonable efforts to reunify Deborah with Daymond. The court further finds because of Deborah's personal life history of loss as well as her mistrust of DCF and other social service providers, she is unwilling or unable to benefit from any further reunification services.
4. TERMINATION ADJUDICATION
 A. As to the mother, Deborah.
(1) Abandonment.
DCF alleges that Deborah's parental rights should be terminated pursuant to Connecticut General Statutes § 17a-112 (j)(3)(A) because she had abandoned Daymond "in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "It is not lack of interest alone which is the criterion in determining abandonment. Abandonment under § 17a-112 (j)(3)(A) requires failure to maintain interest, concern or responsibility as to the welfare of the child. Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are all indicia of interest, concern or responsibility for the welfare of a child . . . Where a parent fails to visit a child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred . . . General Statutes [§ 17a-112
(c)(3)(A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of the child. `Maintain' implies a continuing, reasonable degree of concern." In re Shane P., 58 Conn. App. 244, 251 (2000), quoting from In re Drew R., 47 Conn. App. 124, 129 (1997).
The court finds that two visits to a fragile, premature infant within a period of ten months is significantly below minimal demonstration of interest, love or affection that a parent could show her child. The fact CT Page 8169 that the first visit did not occur until after the child had been in foster care for five months only highlights the lack of interest, concern and responsibility for the child's well-being. The court finds that the mother, Deborah B., abandoned Daymond.
(2) Acts of Commission or Omission.
As an additional ground to support the petition to terminate parental rights, DCF alleges that Daymond:
 "has been denied, by reason of an act or acts of commission of omission, including but not limited to, sexual molestation, severe physical abuse or a pattern of abuse, the care, guidance and control necessary for his physical, educational, moral or emotional well-being." Connecticut General Statutes § 17a-112 (j)(3)(C).
"This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child." In re Felicia,135 Conn. App. 490, 502, 646 A.2d 862 (1994), quoting In re Theresa S.,196 Conn. 18, 25-27, 491 A.2d 355 (1995) and In re Kelly S.,29 Conn. App. 600, 614, 616 A.2d 1161 (1992).
Here, upon Daymond's discharge from the hospital, mother was provided with a schedule of weekly appointments for Daymond to return to the hospital for the purpose of monitoring his weight gain or loss as well as the status of his illness. Deborah failed to keep each scheduled appointment to the detriment of Daymond. Once DCF was informed of the missed appointments, a social worker came to Deborah's home, helped her get the children dressed and ready and drove her to the hospital. Once again, Deborah was provided with instructions to insure Daymond's health and safety. However, just a few weeks after he had been entrusted to her care, he was admitted to the hospital with a diagnosis of failure to thrive. In one day in the hospital and out of his mother's care, Daymond showed an immediate weight gain as well as signs of improving health. The court finds, by clear and convincing evidence, that each missed medical appointment was an act of omission that caused Daymond serious harm. In addition, the failure to provide Daymond with the appropriate nourishment to meet his physical and emotional needs threatened his very existence. As if these acts of omission in the first two months of Daymond's life were not enough, after the child was placed in foster care, Deborah did not maintain contact with her newborn. As stated earlier, she abandoned him. She failed to visit or bond with her child. She behaved in a way that demonstrated a complete disregard and interest in her fragile baby. CT Page 8170 The court finds that this ground has been proven by clear and convincing evidence.
(3) Failure to Rehabilitate.
As a third ground to terminate Deborah's parental rights, DCF alleges that Deborah, as the "mother of a child under seven years who is neglected or uncared-for, has failed, and is unwilling to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of this child and that such parent's parental rights to another child were previously terminated pursuant to a petition filed by the Commissioner of the Department of Children and Families." Connecticut General Statutes § 17a(j)(3)(E).
 "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life." (Citations omitted; internal quotation marks omitted.) In re Eden F., 250 Conn. 674, 741 A.2d 873 (1999)
The clear and convincing evidence presented to the court supports a finding that Deborah has failed to rehabilitate. DCF has been involved in the life of this family for close to ten years. During this period of time, countless referrals have been made to assist Deborah in the role of a single parent to her children. From alcohol and substance abuse treatment to parenting classes, and from case management services to visitation coordination, Deborah has been provided with services designed to empower her to take charge of her life as well as that of her children. The most recent effort to help rehabilitate Deborah was in the form of a service provided in her own home. All that was required of Deborah was that she demonstrate some level of interest in the outcome; and that she be at home. She was unable to meet this minimal requirement. CT Page 8171
Further evidence of her failure to rehabilitate is found in her lack of insight regarding the importance of maintaining contact with her children. The court heard the testimony of department caseworkers repeatedly encouraging Deborah to keep in touch with J. as well as with Daymond. She has been unwilling to do this.
Once the court determines the level of rehabilitation achieved, if any, the court must examine if, within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. Daymond is now one year and five months old and requires specialized care to meet his needs. If Deborah were to seriously undertake a process of rehabilitation, she would require a significant period of time to address the many issues that have challenged her ability to parent her children. The court finds, based on the clear and convincing evidence, that Deborah could not achieve a level of personal rehabilitation within a reasonable period of time, considering Daymond's age and needs, so as to encourage the belief that she could assume a responsible position in his life.
The court has already found that Deborah's parental rights to another child have been terminated.
The court concludes, based on clear and convincing evidence, that DCF has met its burden of proof with regard to this ground.
As to Father, John Doe.
(1) Abandonment.
In view of the fact that Daymond's father has never been identified and no one claiming to be his biological father has come forward, the court finds that DCF has proven this ground by clear and convincing evidence.
(2) No ongoing relationship.
Since Daymond does not know who his father is, the court finds that no parent child relationship exists between them. Further, since Deborah has consistently refused to identify the biological father, the court finds that to allow further time for the possible establishment of such a relationship would be detrimental to Daymond's best interest. The court finds that DCF has proven this ground by clear and convincing evidence.
5. REQUIRED FINDINGS
Before considering the dispositional phase of the termination proceeding, the court makes the following factual findings, based upon CT Page 8172 clear and convincing evidence as required by C.G.S. § 17a-112 (k):
 1. Appropriate and timely services were provided by DCF, including counseling, alcohol and drug treatment referrals, visitation coordination, transportation assistance, and parenting classes.
 2. The court finds, by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. Although DCF was notified by a hospital that a medically fragile infant had missed four critical medical visits, the agency worked with the mother to keep the child safely in the home. Only after it was determined by the hospital, that Daymond was suffering from a physical condition that required his admission to the hospital for acute care, did DCF invoke a ninety six hour hold and apply to the court for an order of temporary custody. Once the order of temporary custody was obtained, DCF engaged in a series of efforts to prepare and assist Deborah for the overwhelming responsibility of providing care to two fragile infants. Deborah, however, was unwilling to cooperate.
 3. DCF set reasonable and realistic goals for Deborah. Unfortunately, Deborah did not do her share of the work. Without Deborah's commitment to undertake the arduous task of self-knowledge, self-improvement and change, the services provided would be of no help to the family.
4. The feelings and emotional ties of the child with respect to the parents, any guardian of the person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties. Daymond has strong emotional ties with his foster family that have provided the physical, emotional and educational supports that Daymond needs. Daymond has no emotional ties to his biological parents, but instead is bonded to this family who is committed to adopting Daymond and providing him with a permanent and stable home. In addition to providing CT Page 8173 Daymond with a safe and stable home, the foster mother testified regarding her efforts to educate herself concerning Daymond's cultural and racial heritage. The court is impressed with the level of awareness and love demonstrated by this foster mother. Her efforts to meet Daymond's needs include the recognition that to be a confidant and self-assured adult, a child needs to know as much as possible about whom he is. It is common knowledge that a child first learns the answers to many such questions from his family. Daymond is indeed fortunate to have such a loving and caring family in his life.
 5. Finding regarding the age of the child. Daymond is one year and five months old. He requires a stability of care.
 6. Finding regarding efforts of the parent to adjust their circumstances, conduct or conditions to make it in the best interest of the child to return such child home in the foreseeable future including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child. Deborah has not adjusted her conditions to make it in the best interest of Daymond to return to her home. As of the date of the trial, Daymond had spent eleven months, almost all of his life, in foster care. The clear and convincing evidence is that Deborah visited him on two occasions. Both visits went well. Deborah, however, was unable to sustain any meaningful contact with her son, Daymond. In addition, she did not maintain regular contact with DCF. Father has made no efforts to have contact with his son. He has not even made efforts to identify himself to his son.
7. Finding regarding the prevention of the parents from having a meaningful relationship with the child. No inappropriate conduct is noted. DCF has CT Page 8174 taken many steps to encourage Deborah to have a meaningful relationship with Daymond. Since father is unknown, there is no evidence that he was prevented from having a meaningful relationship with his son.
6. DISPOSITION
The court finds based upon the testimony and evidence presented that it would be in the best interest of Daymond to terminate his parents' parental rights at this time. The court further finds that Deborah is unable to meet Daymond's special needs at this time or in the foreseeable future. Given the mystery surrounding the identity of the biological father, the court finds that John Doe is also unable to meet his son's special needs at this time or at any time in the foreseeable future. Given the relationship that Daymond has with his foster parents as well as his need for a secure and permanent home and the totality of the circumstances, the court finds that the termination of the biological parents' parental rights is in Daymond's best interest.
It is accordingly, ORDERED, that the parental rights of Deborah B., and John Doe are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. If the foster family is willing to adopt Daymond, the court directs DCF to give this family serious consideration. In addition, a permanency plan shall be submitted in accordance with the Adoption and Safe Families Act.
Carmen L. Lopez, Judge Child Protection Session