MEMORANDUM OF DECISION
This memorandum of decision addresses a petition filed on September 12, 2001, seeking to terminate the parental rights (TPR) of Doreen C. and CT Page 5920 Felix R., the biological parents of Felicia R., born April 1995. The Department of Children and Families (DCF) obtained custody of Felicia in early February 1997: on April 14, 1997, the court found Felicia to be neglected, ordered protective supervision, and allowed her to return to the custody of Doreen C. On September 10, 1997, the court committed Felicia to the custody of DCF. The child has been maintained in DCF custody since that date, pursuant to orders of the court.
The original TPR petition against Doreen C. alleged a single ground, failure to rehabilitate. On January 23, 2002, Doreen C. tendered a valid consent to the TPR, and the petition was amended to reflect this sole ground against the respondent mother. The TPR petition against Felix R. alleged the grounds of abandonment and failure to rehabilitate. The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over the pending case, and notice of this proceeding was provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of Felicia.
Trial of this highly-contested matter took place on January 23 and 24, 2002. The petitioner, Felix R. and the minor child were vigorously represented by counsel throughout the proceedings. On January 17, 2002, prior to the commencement of trial, counsel for Felix R. submitted a Motion for Transfer of Guardianship, imploring the court to make Felicia's paternal grandmother responsible for the child's care. For the reasons stated below, the court finds all matters in favor of the petitioner, and denies the pending motion.
 I. FACTUAL FINDINGS
The Court has considered the verified petition, the TPR social study materials,[2] and the multiple other documents submitted in evidence which included: police records, psychologist's and therapist's reports, and DCF correspondence. The court utilized the applicable legal standards in considering this evidence and the testimony of trial witnesses, who included DCF caseworkers, the child's therapist, her paternal grandmother, and Felix R.[3] Upon deliberation, the court finds that the following facts were proven by clear and convincing evidence at trial:
I. A. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF APRIL 14, 1997
Felix R. was born on November 4, 1975. He completed the eleventh grade, has worked in unskilled positions, and has had periods of unemployment. (Exhibits 1, 3, 8.) Felix R. has a history of mental illness, depression and psychotic symptoms such as auditory CT Page 5921 hallucinations and paranoia. (Exhibits 1, 8.) Felix R. himself has been physically abused, and he attributes his difficulties to this experience. (Exhibit 8.)
Doreen C. was born on April 26, 1977. She met Felix R. in 1994, when she was sixteen years old. In their ensuing intimate relationship, Felix R. subjected Doreen C. to repeated physical abuse. Felicia was born to the couple on April 1995, and the young family lived together for the next year and a half. (Exhibit 1; Testimony of Maria A., Felix R.) In October 1996, Doreen C. took Felicia and left Felix R.'s residence, to avoid his pattern of domestic violence. (Exhibit 1.) At that point, Doreen C. had secured a restraining order which prohibited Felix R. from seeing the child. (Testimony of Felix R.)
Doreen C. and Felicia came to DCF's attention several months later upon a report that the respondent mother was physically mistreating the child. Felix R.'s whereabouts were unknown at that time. (Exhibit 1; Testimony of Bedzaida B.) On February 5, 1997, DCF imposed a 96-hour hold on Felicia, and secured an ex parte Order of Temporary Custody (OTC) from the court (Wiese, J.) on February 7, 1997. In the absence of the respondent father, the court also issued Specific Steps to facilitate Felicia's return to her parents. (Exhibit 6.) The OTC was sustained on February 14, 1997 (Wiese, J.) and for a time thereafter, Doreen C. actively participated in the rehabilitation process. On April 14, 1997, the court (Wiese, J.) adjudicated Felicia a neglected child, and she was returned to Doreen C.'s care under protective supervision. (Exhibits 1, 2, 3, 4.)
I. B. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF APRIL 14, 1997
On July 24, 1997, a second 96-hour hold was invoked for Felicia, upon allegations that Doreen C. was again physically abusing the child.[4]
On September 10, 1997, the court (Ward, J.) granted the petitioner's motion to modify the protective supervision disposition, and Felicia was committed to DCF. (Exhibit 4.) Felix R. did not participate in those court proceedings. He had no contact with either Doreen C. or Felicia from the time they left his home in October 1996 until September 1997, when he learned that his child was in DCF custody. (Testimony of Felix R.) Felix R. then met with DCF and expressed interest in serving as a resource for his daughter. DCF specifically advised Felix R. that to serve in this capacity, he needed to obtain a substance abuse evaluation, participate in an anger management program, and attend parenting education classes. (Testimony of Bedzaida B., Felix R.) Felix R. was defensive and verbally abusive at that meeting, denying the need for attention to his anger problems which had previously manifested themselves in domestic violence, and which now affected his relationship CT Page 5922 with the DCF staff.
At that time, DCF nonetheless scheduled weekly one-hour supervised visitation at a location that was convenient to Felix R. (Exhibit 4; Testimony Bedzaida B.) However, Felix R. failed to consistently comply with the visitation schedule. See Part II. B. 1. He missed weeks and months of visits without appropriately advising DCF of his absence, leaving Felicia without adequate preparation for the cancellations that resulted. (Exhibits 2, 5; Testimony of Bedzaida B., Felix R.) From September 1997 through October 1998, Felix R. failed to maintain a steady job, and was often unemployed.[5] He did not maintain a stable residence and moved from location to location, often without advising DCF of his new address or a phone number at which he could be reached. In the spring of 1998, DCF clearly advised and reminded Felix R. that he was required to maintain suitable housing and stable employment, attend an anger management program and visit on a regular basis, in order to achieve reunification with Felicia. (Testimony of Bedzaida B.) On November 1, 1998, DCF provided Felix R. with expectations to facilitate the rehabilitation process, specifying that he should cooperate with DCF to enhance his contact and communication with his child; visit Felicia weekly; participate in anger management counseling; and avoid involvement with the criminal justice system.[6] (Exhibit 3.)
In September 1999, Felix R. began receiving individual therapy from Ron B., Ph.D., a practitioner affiliated with a local medical center. (Exhibit 8.) Although Felix R. did not participate in his assigned group therapy sessions, his attendance at individual counseling sessions was generally satisfactory. At that time, Felix R. was receiving medication for his continuing problems with depression and psychotic symptoms. (Exhibit 8.)
Overall, Felix R.'s pattern of visitation continued to be sporadic through the years. (Exhibit 1; Testimony of Kenneth C., Bedzaida B.) As she neared school age, Felicia grew increasingly distressed when her father failed to appear at expected visits. In January 2000, DCF responded to this concern by scheduling visits on a monthly, rather than a weekly, basis, to take place at a location near Felix R.'s last known residence.[7] (Exhibits 11, 12; Testimony of Kenneth C., Olivia H.) In January and in February 2000, DCF wrote to advise Felix R. of this change. Felix R. visited with Felicia on April 4, 2000, then independently suspended contact with the child and DCF. He has not seen Felicia since that date, and his whereabouts were unknown to DCF for the following fourteen months. (Exhibit 1; Testimony of Bedzaida B., Kenneth C.)
On August 29, 2000, after hearing, the court (Santos, J.) found that CT Page 5923 further reunification efforts were no longer appropriate for Felix R. On October 6, 2000, Felicia was returned to the care of Doreen C. However, as found in Part I.C., this reunification effort failed, and by February 2001, the child was returned to foster care. (Exhibits 1, B.)
After having failed to inquire about his child for over a year, Felix R. called DCF on June 27, 2001, and stated that he had been residing in Florida since May. (Exhibit 1; Testimony of Kenneth C., Felix R.) Felix R. returned to Connecticut and asked to become involved with visitation and other services. (Exhibit 1; Testimony of Kenneth C.) In view of Felix R.'s lengthy absence and the lack of indication that he had completed services, DCF preliminarily inquired of Felicia's therapist about the effect that reinstatement of visitation might have upon the child. On July 25, 2001, Kathryn L. cautioned that Felicia's emotional status would be adversely affected if Felix R. were permitted to renew visitation with his daughter. (Exhibit 9; see Testimony of Kenneth C., Kathryn L.) DCF specifically advised Felix R. of the basis for the agency's concordant decision to deny visitation, and informed him of the administrative process for reviewing the issue of obtaining visitation with Felicia. (Exhibit 10; Testimony of Kenneth C.)
On August 29, 2001, after hearing, the court (Goldstein, J.) again found that further reunification efforts were no longer appropriate for Felix R. The TPR petition against Felix R. was filed on September 12, 2001, and on January 17, 2002, Felix R. submitted a motion seeking to transfer guardianship of Felicia from DCF to her paternal grandmother, Maria A.[8]
 I.C. FELICIA, THE CHILD
Felicia has spent the better part of her life in foster care. As found in Part I.A., she was first removed from her mother's care upon the issuance of the OTC in February 1997, just before Felicia's second birthday. She occupied several foster homes until mid-April 1997, then returned to Doreen C.'s care under protective supervision, and re-entered DCF's custody later in that year. (Exhibits 1, 2, B; Testimony of Bedzaida B.) Thereafter, Felicia lived in a number of additional foster homes and was placed with Felix R.'s sister, Lydia G. in August 1999. (Exhibit 1; Testimony of Kenneth C.) However, in mid-February 2000, Lydia G. asked DCF to remove Felicia from this family placement due to the child's increasingly aggressive behavior at home and her day care center. (Exhibit 1; Testimony of Kenneth C.) Felicia was placed in foster care with Olivia H. for several months commencing in February 2000.
In October 2000, DCF again reunited with Doreen C., who resumed care of the child. In November 2000, Felicia commenced weekly therapy with CT Page 5924 Kathryn L., a therapist at Catholic Family Services: she found Felicia to have indications of adjustment disorder, conduct disorder, or more serious conditions such as Personality Disorder. (Exhibit I; Testimony of Kathryn L., Kenneth C.) Felicia's oppositional behavior at home and at school grew steadily worse, manifest through screaming, hitting, using knives and threatening to hurt herself and others. (Exhibits 1, 2, B; Testimony of Kathryn L.) After a number of rage-related assaults and a psychiatric evaluation at a local hospital, Felicia was admitted to the Institute of Living (IOL). During her inpatient stay from December 7 through 18, 2000, the IOL staff found no organic explanation for five-and-a-half year old Felicia's escalating oppositional behavior, and attributed her conduct to a problematic residential environment. (Exhibits 1, 2; Testimony of Kathryn L.)
In early 2001, DCF returned Felicia returned to the care of Olivia H., her previous foster mother. (Exhibits 2, B; Testimony of Kenneth C., Olivia H.) In late February 2001, Olivia H. joined Felicia in family therapy sessions with Kathryn L. Felicia has since made steady progress in coping with issues related to the physical and sexual abuse to which she had been subjected as a young child. Felicia has experienced great gains in the ability to control her aggressive conduct, developed a sense of personal safety and security, is happy, and behaves in an age-appropriate manner. Kathryn L. attributes much of Felicia's progress to the guidance and support the child continues to receive from Olivia H.,[9] in whose home she has remained. (Exhibit 9: Testimony of Kathryn L.) Olivia H. desires to adopt Felicia, and the child has expressed her like aspiration. (Exhibit 1; Testimony of Olivia H., Kathryn L.)
 II. ADJUDICATION
For the adjudicatory phase of these proceedings,[10] the court has considered the evidence related to circumstances and events prior to September 12, 2001, the date upon which the TPR petition was filed, insofar as the issues pertaining to abandonment are concerned.[11] With regard to the allegation of Felix R.'s failure to achieve rehabilitation, the court has also considered the evidence related to circumstances occurring through the close of trial.[12] Upon review, as discussed below, the court has determined that statutory grounds for termination exist.
II. A. LOCATION AND REUNIFICATION EFFORTS
As found in Part I.B., after hearing on August 29, 2000 (Santos, J.) and again on August 29, 2001 (Goldstein, J.), the court found that further efforts at reunification were no longer appropriate for Felix R., within the meaning of § 17a-112 (j)(1).[13]
CT Page 5925
Moreover, the petitioner has now proved, by clear and convincing evidence, that reasonable efforts were made to locate and reunify Felix R. with Felicia, within the meaning of the statute, and that the respondent father was unable or unwilling to benefit from these efforts.[14] DCF offered visitation services to Felix R. in 1997, when he first expressed an interest in the child. Weekly visitation at a convenient location was offered from that date through January 2000, in an effort to enhance the connection between father and daughter, although Felix R. failed to make satisfactory use of the visitation opportunities.[15] When Felix R.'s inconsistent attendance became overwhelmingly apparent, visitation was modified to a monthly basis, to reduce emotional distress for Felicia. Felix R. unilaterally suspended visits from April 2000 through July 2001, leaving the state during that period, and leading the child's therapist to prescribe continued suspension of paternal visitation.
DCF's other reunification efforts were similarly unsuccessful. In an effort to utilize Felix R.'s family to promote opportunities for reunification, DCF placed Felicia with Felix R.'s sister, Lydia G. DCF recommended that Felix R. participate in anger management classes in September 1997, in the spring of 1998, and again on November 1, 1998, to address his own confrontational behavior. In addition, DCF recommended that the respondent undergo parenting education, individual counseling to address his mental health issues, and to maintain suitable housing and employment, reinforced through expectations and case management, but the respondent failed to complete or benefit from relevant counseling or programs. (Exhibit 3.) Given the totality of this evidence, and based on the evidence establishing Felix R.'s failure to achieve rehabilitation as set forth in Part II. B. 2., the court is constrained to conclude that this respondent is unable and unwilling to benefit from the reasonable reunification efforts contemplated by § 17a-112 (j)(1).
Felix R. protests that DCF has failed to extend reasonable reunification efforts in this case, in that the agency denied him a fair chance to build a relationship with Felicia or to demonstrate his ability to parent this child.[16] While the court empathizes with the respondent's stated desire to serve as Felicia's parent, a careful review of the evidence provides no objective basis for Felix R.'s complaints. Rather, the evidence clearly and convincingly establishes that, overall, DCF acted in a responsible and professional manner in its dealing with this respondent and the needs of his child. (Exhibit B; Testimony of Felix R.) On balance, it is clear that it was Felix R.'s repeated unwillingness or inability to cooperate with DCF's reasonable reunification efforts, and not unwarranted interference by the agency, that forestalled the development of a long-term relationship between CT Page 5926 father and daughter.[17]
Felix R. also asserts that DCF's reunification efforts were unreasonable because Felicia was not placed in residence with her paternal grandmother, Maria A. During the early part of Felicia's foster care, Maria A. did not indicate her availability as a placement resource for the child, and merely attended some visitation sessions. (Testimony of Bedzaida B.) While Felicia was placed with Maria A.'s daughter and Felix R.'s sister, Lydia G., from August of 1999 through February 2000, Maria A. still did not identify herself as a placement resource, even when the child was removed at Lydia G.'s request. The evidence reveals that Maria A. did not inform DCF until July 2001, when Felix R. returned to Connecticut from Florida, that she would like to have Felicia come to live with her. (Testimony of Kenneth C., Felix R.) By this time, Felicia had been in foster care for over four years. The child had developed a valid emotional attachment to Olivia H., and had begun the process of addressing her significant emotional and behavioral issues. Under these circumstances, notwithstanding Maria A.'s newly voiced interest in hosting Felicia, the child's best interests clearly militated against moving her again. (Exhibit 9; Testimony of Kathryn L.)
The court acknowledges that DCF failed to promptly respond to a court order requiring the agency to issue expectations which could guide Felix R. in the rehabilitation and reunification process: as found in Part I.B., DCF provided Felix R. with expectations on November 1, 1998, several months after the court had ordered the agency to do so. (Exhibit 3.) However, the court has also found, in Part II. B. 1., that Felix R. failed to attend any visitation sessions between April 20, 1998 through October 1998. (Testimony of Bedzaida B.) While the court cannot condone the agency's tardiness, it is apparent that no measurable harm was caused by DCF's delay in the delivery of expectations, during a period when Felix R. was not cooperating with the agency. Under these circumstances, any such delay cannot reasonably serve as the basis for concluding that DCF had failed to use reasonable efforts at reunification. See In reEbony H., 68 Conn. App. 342, 350, ___ A.2d ___ (2002).
Reviewing the evidence in its totality, it is clearly and convincingly apparent that DCF's reunification efforts were thwarted by Felix R.'s own behavior, "not the conduct of the department." In re Amelia W.,62 Conn. App. 500, 506, 772 A.2d 619 (2001); see In re Ebony H., supra,68 Conn. App. 350. It was the respondent's failure to cooperate with the proffered visitation regimen and recommended services, along with his failure to achieve rehabilitation,[18] but not DCF's placement decisions or other actions, that served to impede the process of reunifying the respondent father with the child at issue. Accordingly, based on the clear and convincing evidence produced at trial, the court CT Page 5927 concludes that Felix R. is either unable or unwilling to benefit from reasonable reunification efforts, within the meaning of § 17a-112 (j) (1).
II. B. STATUTORY GROUNDS FOR TERMINATION AS TO FELIX R.
II. B. 1. ABANDONMENT — § 17a-112 (j)(3)(A)
The petitioner first alleges that Felix R. abandoned Felicia within the meaning of § 17a-112 (j)(3)(A).[19] Applying the requisite legal standards,[20] and construing the statute in accordance with §17a-112 (p),[21] the court finds this matter in favor of the petitioner.
The evidence clearly and convincingly reveals that prior to Felicia's adjudication as a neglected child in April 1997 and continuing through September 12, 2001. the adjudicatory date. Felix R. failed "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." In re Deana E., supra, 61 Conn. App. 193. Felix R.'s desultory efforts at visitation amply demonstrate his abandonment of this child. As found in Part I.B., Felix R. had no contact with Felicia from October 1996, when the child was eighteen months old, through the fall of 1997.[22] Although in September 1997 he secured the opportunity for weekly visitation, Felix R. almost immediately commenced a pattern of infrequent and unpredictable contact with his daughter.[23] He attended only five visits between September 1997 and January 1998; attended only four visits from January 1998 through April 20, 1998, and failed to appear at any of the visits scheduled from April through October 1998. (Testimony of Bedzaida B.) From October 1998 through April 2000, Felix R. continued to see Felicia only on a sporadic basis, despite DCF's continued extension of weekly opportunities for father-daughter contact. After visiting with Felicia on April 4, 2000, Felix R. unilaterally discontinued all attendance at visits. After absenting himself from Felicia over a year, Felix R. requested that DCF resume offering visitation: however, DCF denied this request in reasonable reliance upon the opinion of Felicia's therapist.[24] (Testimony of Kenneth C., Kathryn L.) Felix R.'s conduct in inconsistent, inattentive and unpredictable efforts at visiting Felicia over the past five years reveals only a minimal degree of interest, concern or responsibility as to the welfare of his daughter. Such a "sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child," without a meaningful commitment to personally interacting with her or displaying love and affection for her, is competent to establish abandonment of Felicia.[25] In re Deana E., supra, 61 Conn. App. 193. CT Page 5928
Other features of the clear and convincing evidence further indicate that Felix R. has statutorily abandoned Felicia. Visitation aside, he has inadequately communicated with the child's custodian or her caregivers. On those rare occasions when Felix R. did call DCF prior to the summer of 2001, he did not inquire about his daughter's health or well-being, but merely sought visitation opportunities to satisfy his own needs.[26]
After he returned to Connecticut in July 2001, Felix R. contacted DCF somewhat more frequently, but still failed to ask for information about Felicia's progress and development, only discussing visitation. (Testimony of Kenneth C.) Felix R. has sent cards or written communications to the child on rare occasion. (Exhibit 2; testimony of Kenneth C., Leroy H., Bedzaida B.) He has never made any measurable financial contribution to Felicia's support: since Felicia left his household in October 1996, he has failed to supply his child's necessary food, shelter and medical care, and has not regularly furnished her with social and religious guidance. In failing to support Felicia, or to meet these aspects of her needs for over five years, Felix R. has abandoned both his parental role and his child.[27] In re Deana F., supra.61 Conn. App. 193. In re Shane P., 58 Conn. App. 244, 256, ___ A.2d ___ (2000).
In sum, the evidence clearly and convincingly establishes that from October 1996 through the adjudicatory date, Felix R. has failed the test of meeting, on a continuous basis, "[t]he commonly understood obligations of parenthood" identified In re Deana F., supra, 61 Conn. App. 193. Even if it could be found that Felix R. began to demonstrate appropriate interest in the child during the summer of 2001, when he returned to Connecticut, such conduct occurring nearly four years after the date of commitment would be too little, and too late, to overcome the respondent's long and clear course of abandonment.[28] In re SheilaJ., 62 Conn. App. 470, 480-82, ___ A.2d ___ (2001). Accordingly, based on clear and convincing evidence presented in this case, the court finds that the petitioner has met her burden of proving that Felix R. has abandoned Felicia, within the meaning of § 17a-112 (j)(3)(A).
II. B. 2. PARENTAL FAILURE TO REHABILITATE — § 17a-112 (j)(3)(B)
The petitioner next alleges that Felix R.'s parental rights should be terminated because he has failed to achieve rehabilitation within the meaning of § 17a-112 (j)(3)(B)(i).[29] Felix R. counters that he has made due progress in rehabilitation, warranting resumption of a responsible role in Felicia's life. As Felicia was found to be neglected on April 14, 1997, the critical issue for this court is whether the respondent has achieved rehabilitation in the statutory sense. Applying the requisite legal standards,[30] and construing the statute in CT Page 5929 compliance with § 17a-112 (p), the court finds this issue in favor of the petitioner.
Various aspects of the clear and convincing evidence in this case compel the conclusion that Felix R. has yet to achieve a sufficient degree of rehabilitation with regard to his issues of anger, violence, mental health and parenting skills as would encourage the belief that within a reasonable time he could assume a responsible position in his daughter's life. See In re Daniel C., 63 Conn. App. 339, 353-54, ___ A.2d ___ (2001); In re Ashley S., supra,61 Conn. App. 665; In re Sarah AnnK., supra, 57 Conn. App. 448. First, the court finds that the evidence related to Felix R.'s mental health and anger issues clearly and convincingly establish that the respondent has not achieved § 17a-112
(j)(3)(B) rehabilitation. Although he was unwilling to participate in the group therapy that was made available to by Dr. Ron B. in the fall of 1999, Felix R. did attend a number of individual counseling sessions with this therapist. The respondent thereby gained some insight into his symptoms and improved his psychiatric stability. (Exhibit 8.) However, the evidence reasonably permits the inference[31] that, to the detriment of the rehabilitative process, Felix R. stopped his treatment before it was completed, even while he continued to be affected by symptoms related to his long standing paranoid features, such as feeling that people were watching him and laughing at him in public places. (Exhibit 8.) The evidence permits the further inference that Dr. Ron B.'s counseling did not enhance Felix R.'s ability to understand the importance of visiting his daughter, given that visitation was erratic and inconsistent in late 1999 and early 2000 while he was undergoing Dr. Ron B.'s counseling, and given the respondent's decision to abstain from visitation from April 2000 through late June 2001. By December 2001, Felix R. had stopped taking the medication for his symptoms of psychosis and depression, stopped seeing a mental health clinician, and unrealistically denied having any mental health issues. (Exhibit B.) Overall, even if Dr. Ron B.'s counseling may have some beneficial effect in helping Felix R. to manage his own life and mental health issues, the evidence supports the court's conclusion that the respondent's brief stint of therapy did not improve his ability to care for Felicia's particular needs.[32] In re Sarah Ann K., supra, 57 Conn. App. 448.
Second, the court finds by clear and convincing evidence that Felix R. did not satisfactorily cooperate with the rehabilitation process, and did not adequately meet the expectations provided to him in November 1998 in an effort to guide him toward rehabilitation and improvement of his performance as a parent. (Exhibit 3.) As found in Parts I.B. and II.B. 1., Felix R. infrequently met with Felicia despite DCF's offers of weekly visits at a convenient location, and repeated reinforcement of the need for this father to increase his contact with his daughter. Although he CT Page 5930 communicated well with Felicia when visits did occur, Felix R. did not consistently notify DCF when he could not attend visits, and never developed an understanding of the difficulties and concerns that his unexplained periodic absences caused his young daughter to suffer. (Exhibits 3, 5.) Felix R.'s cessation of visitation in April 2000, followed by a protracted, unforseen absence, well illustrates both his lack of cooperation with DCF and his failure to adequately develop an ability to serve as an appropriate parent for this child. (Exhibit 2.)
Third, the court finds by clear and convincing evidence that Felix R. remains adversely affected by his pattern of angry, hostile responses to stressful situations. Such behaviors are clearly contraindicated in any caretaker for Felicia, who has her own special behavioral needs. Although Felix R. has generally refused to acknowledge that he has a history of problems in managing his anger, his domestic violence with Doreen C., the issuance of a restraining order against him, and his conviction for assault in 1997 amply establish this pattern of conduct. (Exhibits 1, 7; Testimony of Felix R.) Felix R. failed to timely complete an anger management program or counseling, despite DCF's recommendations that he do so in September 1997, in the spring and fall of 1998. (Exhibit 3; Testimony of Bedzaida B.) Although Felix R. became involved in individual counseling a year later, he still evinced anger during treatment sessions in 2000,[33] and did not complete this therapy. (Exhibits 3, 5, 8.) Felix R. prematurely stopped attending parenting classes and an anger management program he had started at Catholic Family Services in 2000, and did not complete either program. (Exhibits 3, 5; Testimony of Felix R., Leroy H.) Felix R. presented in a very angry mood, threatening and argumentative in his demeanor at many of the visitation sessions which he did attend. The evidence clearly and convincingly establishes both that Felix R.'s conduct and interpersonal contacts are significantly affected by his underlying and unresolved issues with anger, which he has yet to learn to control. Felix R. thus remains without the ability to appropriately respond, without anger or hostility, to the vicissitudes of parenting a child, such as Felicia, who is likely to present her caretaker with the frustration-inducing behaviors intrinsic to her age, development, and psychological status.
Fourth, the clear and convincing evidence leads the court to conclude that Felix R. has not yet achieved a secure lifestyle, notwithstanding the passage of more than four years since his daughter's commitment to DCF. Instead of developing the ability to maintain a stable home or residence such as that which would foster the growth and development of a child such as Felicia, he has moved from location to location over the years.[34] (Exhibits 1, 2, 3, 4, 5; Testimony of Bedzaida B.) Felix R. has never held steady employment, although he has occasionally worked in places such as a fast food restaurant, K-Mart and a supermarket. In recent CT Page 5931 years, Felix R. left a job due to the symptoms caused by his unresolved mental health issues: these conditions remain undertreated, further supporting the conclusion that Felix R. has not gained the ability to support or to care for his child. (Exhibit 8; Testimony of Bedzaida B., Kenneth C., Felix R.)
Based on the facts presented in this case, the court finds that Felix R.'s rehabilitation is not foreseeable within a reasonable time. In reDaniel C., supra, 63 Conn. App. 353-354. In reaching this conclusion, the court has analyzed Felix R.'s relative lack of present rehabilitation as it relates to Felicia's needs for a responsible parent who can provide her with emotional stability, security, and consistency. Even if Felix R. should now actively engage in rehabilitation, learn parenting skills, curb his anger, resume appropriate medication and care for his mental health issues, those efforts would be "too little and too late" for Felicia, who has primarily resided in foster care since 1997. In reSheila J., supra, 62 Conn. App. 481.
In opposing the allegation that he has failed to achieve rehabilitation, Felix R. pleads for yet another chance at serving in a paternal, caretaking role, and protests that he has never wilfully mistreated his daughter. (Exhibit B; Testimony of Felix R.) However well-meaning he may be in taking this position, it is clear that the respondent father remains without the ability to understand his daughter's basic emotional needs, let alone her complex psychological profile. He lacks a parenting skill which is critical to maintaining the well-being of this child, and thus he cannot adequately fulfill a constructive and useful parenting role for her.[35] In re Daniel C.,
supra, Conn. App. 353-54. Felix R. has made no measurable progress in developing parenting skills during Felicia's long period of commitment to DCF. Waiting any longer for the respondent to attempt to learn to parent this child would force further deferral of permanency. As found in Parts III and IV. B., any such delay would be detrimental to Felicia's best interests, as this child should not, at this stage of the proceedings, be required to sacrifice the stability she now experiences in her successful foster placement. See In re Shamika F., supra, 256 Conn. 405-06.
Thus, in its totality, the evidence shows that despite some participation in the rehabilitation process, Felix R. has not achieved the qualities necessary to successfully parent Felicia. He lacks the ability to assume a responsible position in her life within a reasonably foreseeable time. Based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved Felix R.'s failure to achieve rehabilitation pursuant to § 17a-112 (j)(3)(B).
 III. MOTION FOR TRANSFER OF GUARDIANSHIP
CT Page 5932
Felix R. has moved the court to appoint Felicia's paternal grandmother, Maria A., as the child's guardian.[36] Upon due consideration, it is clearly and convincingly apparent that a transfer of guardianship to Maria A. would be detrimental to this child's best interests.[37] Accordingly, the court declines to grant the relief requested.
It is abundantly clear that Maria A. supports her son in opposing the TPR allegations. It is equally clear that Maria A. loves Felicia and is sincerely interested in the child's well-being.[38] Maria A. believes that she is now capable of caring for Felicia, with whom she had frequent contact during the first months of her life and again during her placement with Lydia G., although she has not seen the child since Felicia left Lydia G.'s home over two years ago.[39] (Exhibit B; Testimony of Maria A., Leroy H.) While this court acknowledges the earnestness of Maria A.'s current efforts to reassert her relationship with her granddaughter, in assessing the propriety of a transfer of guardianship, the court must focus on the needs of the child at issue, not merely on the desires of a well-meaning relative who desires to serve as a caregiver.
Here, the clear and convincing evidence establishes that Felicia continues to have significant special needs that will require informed supervision and attention throughout the remaining years of her childhood. The highly disturbing behaviors inherent in her Adjustment Disorder are currently quiescent, due to her therapy with Kathryn L. and the assistance of Olivia H. (Testimony of Kathryn L.) However, Maria A. is unaware of, or unwilling to recognize, the level of emotional and behavioral problems that have so adversely affected Felicia in the past. She has neither understanding nor knowledge of Felicia's aggressive and destructive behavior during her residence with Lydia G., the events causing her hospitalization at the IOU, or the nature of parenting required by a child with such underlying psychological challenges. (Testimony of Maria A., Kathryn L.) In addition, Maria A.'s trial testimony clearly indicated that she is either unaware of or unwilling to recognize Felix R.'s problems with anger. This fact raises the reasonably foreseeable potential that if Felicia were to live with her grandmother, the child would be exposed to her father's aggression without appropriate support from her caretaker. (Testimony of Bedzaida B.)
In view of Felicia's diagnosed Adjustment Disorder, her history of emotional instability and anti-social behavior, the court finds that the child's interests will best be served if she can easily communicate with her caregiver. The evidence clearly and convincingly establishes that a significant language barrier exists between Felicia and Maria A.: if CT Page 5933 Felicia were placed with her grandmother, this barrier would limit caretaker and child to rudimentary verbal communication, at least for a time which must be seen as inappropriate in view of Felicia's underlying psychological challenges.[40] While Maria A. believes that Felicia will be able to communicate effectively with her if they live together, Felicia is relatively unfamiliar with Maria A.,[41] leading the court to conclude that a transfer of guardianship could only be achieved at an unwarranted cost to the child.
In the context of Felix R.'s motion for transfer and the pending TPR proceedings, where grounds for termination have been found to exist, the court finds it appropriate to consider the evidence relating to the suitability of Felicia's foster parent when assessing the best interests of the child.[42] See In re Vincent D.; 65 Conn. App. 658, 666, ___ A.2d ___ (2001). The evidence clearly and convincingly reflects that Olivia H. fully meets Felicia's emotional, educational, medical and social needs, creating a living environment in which the child feels, and is, safe and cared for. (Exhibit 13.) Olivia H. understands Felicia's mental health needs and communicates with her in a way that truly benefits the child.[43] Olivia H. provides Felicia with stability and consistency in parenting and behavior management, which has led to the development of a very loving, strong and healthy relationship between foster mother and child. (Testimony of Kathryn L.)
The totality of the evidence thus compels the conclusion that transferring guardianship would not serve Felicia's best interests. Such a transfer would require removing Felicia from a setting in which her special needs are well met by her foster mother. into a home with which she is relatively unfamiliar and where it is not apparent that her special needs would be effectively addressed. In re Shane P., supra,58 Conn. App. 260-61. See also In re Juvenile Appeal (85-BC), supra,195 Conn. 367; see also In re Helen B., 50 Conn. App. 818, 826 (1998). The transfer of guardianship would mean deprive Felicia of the opportunity to live with her foster sibling, Giulicia, who has been adopted by Olivia H. and with whom she has a firm, sisterly relationship. Id., 261. Transferring guardianship to Maria A. would unnecessarily place Felicia in "yet another transitional domicile," exposing the child to the recurrent potential that during the period of commitment, guardianship could again be challenged, and depriving her of the opportunity for permanency which she so clearly deserves. In re ShaneP., supra, 58 Conn. App. 261-62.
Felicia's counsel persuasively argues that the child wants, needs, and deserves permanency now, and that any effort to delay termination, by transferring guardianship, would adversely affect the child's interests.[44] Based on all of the foregoing, the court CT Page 5934 concurs, and hereby denies the Motion for Transfer of Guardianship dated January 17, 2002.
 IV. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child." (Citation and quotation marks omitted.) In reQuanitra M., supra, 60 Conn. App. 103; see also In re Valerie D.,223 Conn. 492, 511 and n15, 613 A.2d 478 (1992). In this dispositional phase the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
 IV. A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights. See In re Jonathon G., 63 Conn. App. 516, 528 ___ A.2d ___ (2001). Such findings are required only as to Felix R., in light of Doreen C.'s valid consent to TPR. § 17a-112 (k).
IV. A. 1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112(k)(1)
Multiple timely and appropriate services were provided for Felix R., including visitation services, case management, and reference to parenting, mental health and anger management programs, as set forth in Part II. A. This respondent was unable or unwilling to benefit from such services, primarily due to his lack of timely cooperation with the child protection agency, as found herein. Additionally, the evidence reflects that on two separate occasions, August 29, 2000 and August 29, 2001, the court found that further efforts at reunification were no longer appropriate for Felix R., within the meaning of General Statutes §17a-112 (j)(1).
IV. A. 2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — §17a-112 (k)(2)
DCF made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, as found in Part IV. A. 1. This court has found that Felix R. is unable or unwilling to benefit from reunification services.
IV. A. 3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k)(3)
CT Page 5935
No relevant orders of the Juvenile Court had been effectively imposed upon Felix R.
IV. A. 4. THE CHILD'S FEELINGS AND EMOTIONAL TIES — § 17a-112(k)(4)
Felicia has no measurable bond to Felix R. She rarely mentions her biological father now, although she had talked about him prior to February of 2001. Illustrating the lack of an emotional connection to the respondent, the evidence reflects that Felicia has informed her therapist that she no longer has a father, although she did at one time. (Testimony of Kathryn L., Olivia H.)
Felicia grew attached to her foster mother, Olivia H., during her first placement in February 2000, and their bond has flourished since Felicia returned to Olivia H.'s care in early 2001. (Exhibits 9, 13; Testimony of Kathryn L.) Felicia calls Olivia H. "mommy", and is also bonded to her foster sister, Giulicia, whom Olivia H. has adopted. (Testimony of Kathryn L., Leroy H.)
Felicia enjoys interacting with her step sister, Vanessa. She appreciates her visits with Doreen C., although she understands that she cannot function in a mothering role. (Exhibits A, B.)
IV. A. 5. AGE OF THE CHILD — § 17a-112 (k)(5)
Felicia was born on April 1995, and is now seven years old.
IV. A. 6. PARENT'S EFFORTS TO ADJUST HIS CIRCUMSTANCES — §17a-112 (k)(6)
Felix R. has not maintained adequate contact with Felicia, the foster mother or DCF regarding the status of his daughter. As described in Part II, he has not made realistic and sustained efforts to conform his conduct to even minimally acceptable parental standards. Giving him additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited with him.
IV. A. 7. EXTENT TO WHICH PARENT WAS PREVENTED FROM MAINTAININGA RELATIONSHIP WITH THE CHILD — § 17a-112 (k)(7)
No unreasonable conduct by the child protection agency, foster mother or third parties prevented Felix R. from maintaining a relationship with Felicia, although the reasonable limitations and restrictions inherent in CT Page 5936 the foster care system were in effect. Felix R.'s contact with the child was, at one time, subject to a court order limiting his contact with Doreen C., and DCF reasonably determined that visitation should not be resumed in the summer of 2001, based upon the recommendations of the child's therapist. Based on the totality of the evidence, the court finds that Felix R.'s economic circumstances did not prevent him from maintaining a relationship with his daughter, as DCF arranged for visitation to occur near the respondent father's home, minimizing any problems with transportation. See also Part II. A.
IV. B. BEST INTERESTS OF THE CHILD — § 17a-112 (j)(2)
Having found the existence of statutory grounds for termination of the parental rights of Doreen C. and Felix R., the court is next called upon to determine whether termination would be in Felicia's best interests.[45] Applying the appropriate legal standards[46]
to the clear and convincing evidence in this case, and referencing Part III., the court finds this issue in favor of the petitioner.
In determining whether termination of the respondents' parental rights would serve Felicia's best interests, the court has examined the multiple relevant factors, including the child's interests in sustained growth, development, well-being, stability and continuity of his environment; her many years in foster care; the nature of her relationship with Olivia H.; and her relationship with the respondents.[47] In re Alexander C.,
supra, 60 Conn. App. 559; In re Shyina B., 58 Conn. App. 159, 167, ___ A.2d ___ (2000); In re Savanna M, supra, 55 Conn. App. 816. In a matter such as this, the court is further called upon to balance Felicia's intrinsic needs for stability and permanency against the maintenance of any connection with his biological parents. See Pamela B. v. Ment,244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity). Under such scrutiny, the clear and convincing evidence in this matter establishes that it is not in Felicia's best interests to continue to maintain any legal relationship with either of her biological parents.
While Felicia has made great strides in her ability to manage her inappropriate conduct, it is clear that some behavioral problems persist, manifest by the child's disruptive activity in the classroom. (Exhibit B.) Felicia is currently in first grade, thriving and healthy. (Testimony of Olivia H.) As discussed in Part III. and as emphasized by Felicia's counsel, the evidence clearly and convincingly establishes that the child's progress and stability are due, in large part, to the exemplary parenting provided by Olivia H., so that any change in placement would be highly disadvantageous to the child's growth, CT Page 5937 well-being, and healthy development.
Notwithstanding Felicia's special needs, Felix R. believes that he is ready to play a major role in his daughter's life.[48] It is important for all to acknowledge that parenting involves more than just providing lovely outfits or gifts to delight a child. Parenting involves nurturing, care, guidance and showing knowledgeable, consistent support for the child in question. The circumstances of this case clearly and convincingly reflect that while his daughter has been in foster care, Felix R. has never reached the point where he can be relied upon to meet these critical needs. Our courts have recognized that "long-term stability is critical to a child's future health and development." In reEden F., supra, 250 Conn. 709. Furthermore, "[blecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re AlexanderV., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see also In re JuvenileAppeal (84-CD), 189 Conn. 276, 292, 455 A.2d 1313 (1983). It is not in Felicia's best interests to allow her to languish, awaiting the potential that Felix R. will develop such abilities, while she occupies the uncomfortable position of being forced to continuously choose between her foster mother and the spectre of reunification with her biological father. Simply put, Felicia "should not be further burdened by having to wait for [her father] to achieve the level of competency necessary" to serve as her parent: In re Amneris P., supra, 66 Conn. App. 385.
Both Felicia's attorney and her therapist, Kathryn L., have submitted that this child can best be served by ending, without further delay, the long period of uncertainty as to the availability of her biological parents as caretakers. Severance of her legal bonds to Felix R. and Doreen C., freeing Felicia for adoption, will best eliminate the stressful circumstances which envelop Felicia while the TPR issues remain before this court. Doreen C. agrees that she is unable to provide Felicia with a stable and secure upbringing. (Exhibit B.) Through her consent to TPR, Doreen C. has demonstrated her wise and compassionate acknowledgment that her daughter will best be served by termination of her parental rights. Balancing Felicia's intrinsic need for stability and permanency against the benefits of maintaining a legal connection with Felix R., the clear and convincing evidence in this case similarly militates in favor of termination of the respondent father's parental rights, for all the reasons described above. Pamela B. v. Ment, supra, 244 Conn. 313-314.
Accordingly, with respect to the best interests of the child contemplated by § 17a-112 (j)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of CT Page 5938 these respondents will serve the child's best interests.
 V. ORDER OF TERMINATION
WHEREFORE, after due consideration of Felicia's's sense of time, her need for a secure and permanent environment, the relationship she has with her foster mother, and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the child's best interests, the court issues the following ORDERS:
That the parental rights of Doreen C. and Felix R. are hereby terminated as to the child Felicia R.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Felicia R. for the purpose of securing an adoptive family or other permanent placement for her.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law. That primary consideration for adoption of Felicia R. shall be offered to her current foster parent.
BY THE COURT,
N. Rubinow, J.